*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 13-CV-1027

JOSE RODRIGUEZ, *et al.*, APPELLANTS,

V.

DISTRICT OF COLUMBIA, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-7096-11)

(Hon. Anthony C. Epstein, Trial Judge)

(Argued February 4, 2015                    Decided September 17, 2015)

*Daniel J. McCartin*, with whom *Anthony M. Conti* was on the brief, for appellants.

*Holly M. Johnson*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for appellees.

Before FISHER and EASTERLY, *Associate Judges*, and RUIZ, *Senior Judge*.

FISHER, *Associate Judge*: Metropolitan Police Department ("MPD") officers

Jose Rodriguez, Andrew Zabavsky, and Benjamin Fetting sued the District of

Columbia and other defendants[1] for alleged violations of the Whistleblower Protection Act (the "WPA").[2] The trial court rejected those claims, granting summary judgment to the defendants. The officers now appeal from that order and also assert that the court abused its discretion by denying their motion for leave to amend their complaint. Because no reasonable juror could have found that appellants made protected disclosures, or that prosecutors from the Office of the Attorney General ("OAG") either issued illegal orders to appellants or interfered with Zabavsky's right to furnish information to the Council of the District of Columbia (the "Council"), and because, as we explain below, the proposed amendment to appellants' complaint would have been futile, we affirm.

## I.  Introduction

The WPA was enacted to safeguard "the public interest [that] is served when employees of the District government are free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of

---

[1]  The other defendants were Deputy Attorney General Robert Hildum, Assistant Deputy Attorney General Alicia Washington, Criminal Section Chief M. Kimberly Brown, and MPD Assistant Chief Michael Anzallo.

[2]  D.C. Code §§ 1-615.51—615.59 (2001 & 2010 Supp.).

retaliation or reprisal." D.C. Code § 1-615.51 (2001). It prohibits a supervisor from taking or threatening to take a "prohibited personnel action" against a government employee or otherwise retaliating because of the employee's "protected disclosure" or his refusal to comply with an "illegal order." D.C. Code § 1-615.53 (a) (2001). It further provides that no person shall "interfere with or deny the right of employees . . . to furnish information to the Council." D.C. Code § 1-615.53 (b) (2010 Supp.). To protect these rights, the WPA established a civil cause of action, allowing aggrieved employees to seek monetary and equitable relief. D.C. Code § 1-615.54 (a)(1) (2010 Supp.).

Appellants claim that they made protected disclosures which reported gross mismanagement, violations of law, and gross misuse of public resources by OAG and MPD in connection with the District's program to combat impaired driving. They also claim that they refused to comply with unlawful orders by OAG prosecutors directing them to limit or "alter" their trial testimony. According to appellants, supervisory employees at MPD and OAG retaliated by instigating misconduct investigations against them and denying them promotions. Officer Zabavsky also contends that OAG interfered with his right to furnish information to the Council about the District's response to problems with its breathalyzer instruments. We discuss these facts at more length below.

## II.    Factual and Procedural Background

In the District, three charges penalize impaired driving: driving under the influence ("DUI"), driving while intoxicated ("DWI"), and operating while impaired ("OWI").  *See* D.C. Code § 50-2201.05 (b)(1)(A)(i)(I)-(II), (b)(2)(A) (2010 Supp.) (repealed 2013) (currently D.C. Code §§ 50-2206.11, -2206.14 (2014 Repl.)).  DWI is distinguished from the other two charges because it is a *per se* offense, meaning a defendant may be convicted by mere proof that he was operating a vehicle while the concentration of alcohol in his blood, breath, or urine met or exceeded a certain level.  *See* D.C. Code § 50-2201.05 (b)(1)(A)(i)(I) (currently D.C. Code § 50-2206.01 (9)(A)(i) (2014 Repl.)).  MPD officers often used Intoxilyzers—devices for measuring the concentration of alcohol in a subject's breath—to determine whether a motorist was violating the DWI statute.

On February 3, 2010, MPD discovered that some of its Intoxilyzers were reporting inaccurate results.  MPD immediately suspended the use of all Intoxilyzers, instructing officers not to use them pending recertification.  In cases where officers had used Intoxilyzers, OAG decided not to pursue DWI charges and instead proceeded with DUI and OWI charges, which do not require proof of

breath-alcohol content. OAG continued to prosecute for DWI in cases where urine tests had been performed.

## A. Zabavsky's Email to Fellow MPD Officers

About a week and a half after the problem with Intoxilyzers was discovered, an MPD sergeant emailed several officers, including Zabavsky and Rodriguez, notifying them that recertified Intoxilyzers were available. The next day, Zabavsky learned that OAG was still not bringing DWI charges, even in cases involving the recertified Intoxilyzers. On February 22, in a reply to the sergeant's email, Zabavsky shared this information with other officers. He expressed frustration about "why MPD [was] keeping [officers] in the dark" and suggested that the officers use the equipment at other law enforcement agencies (such as the Capitol Police or U.S. Park Police) for breath testing.

## B. Request to Limit In-Court Testimony

Over the next few months, more information about the Intoxilyzers became available. On February 25, the Mayor issued a press release alerting members of the public to the problem and informing them that an investigation was underway.

Representatives from MPD and OAG also notified the D.C. Courts, the D.C. Superior Court Trial Lawyers Association, and the Public Defender Service about the situation. News outlets reported that the Intoxilyzers had compromised nearly 400 convictions, some dating as far back as 2008.

Because "[t]here were all sorts of rumors" floating around about "whether the motors went bad, [or] whether somebody physically . . . tinkered with the instruments," MPD officers "were being pressed about" the Intoxilyzers in court. For impeachment purposes, defense attorneys tried to introduce testimony that officers had signed certifications generated by the Intoxilyzers which later turned out to be false. OAG attorneys argued that testimony about the devices was neither relevant nor material because they "weren't using the MPD Intoxilyzer scores in any of [their] cases."

To keep information that they believed was irrelevant and potentially inaccurate out of their trials, line prosecutors urged appellants to limit their testimony about the Intoxilyzer investigation to first-hand knowledge. For example, one OAG attorney told Rodriguez, "[y]ou can't testify to something that you don't know." The prosecutors explained that, because appellants were not personally involved in the Intoxilyzer investigation, their testimony would be

hearsay. Appellants viewed things differently, however. They believed that they did know about the investigation because they had had "conversations with some people about [it]"; "the word was already out and everything and [they] kind of knew about it." When prosecutors advised them to "just say [I] don't know," they refused to "lie."

### C. Young Matter Referred to Internal Affairs

In July 2010, Deputy Attorney General Robert Hildum referred a matter involving Zabavsky and Rodriguez, and possible tampering with evidence, to MPD's Internal Affairs Division ("IAD"). Four months earlier, the officers had arrested a female suspect, Terran Young, for impaired driving and obtained a urine sample from her. The officers' report stated that a female officer had witnessed the giving of the sample, in accordance with MPD protocol, but also noted that the container was wet and cold, an indicator that toilet water may have been splashed into it.

A toxicology report revealed that the amount of alcohol in Young's urine was less than .02 grams of ethanol per 100 milliliters of urine, well below the DWI threshold of .10 grams. *See* D.C. Code § 50-2201.05 (b)(1)(A)(i)(I). OAG

believed that the urine sample had been diluted; but if an officer had monitored the collection of the sample, as Zabavsky and Rodriguez reported, Young could not have diluted the sample. This discrepancy raised concerns about the veracity of the officers' report. Hildum decided to refer the matter to IAD for investigation because, "[i]f [OAG] didn't do anything," defense attorneys might make allegations that the officers had lied, and "[OAG] might be accused of covering up a problem."

### D. Establishing a New DWI Program

Three months later, Assistant Chief Patrick Burke selected Zabavsky and Rodriguez to attend training on breath-testing and to assume leadership roles in MPD's new DWI program. However, Burke later learned from OAG that Zabavsky and Rodriguez were under investigation for evidence tampering. Assistant Chief Michael Anzallo (the leader of IAD) advised Burke to find other officers. Although Zabavsky and Rodriguez's "infraction [might] turn out to be [minor]," the investigation involved their "veracity" and "the program [needed] to be very clean." Burke decided to rescind his offers to Zabavsky and Rodriguez. He next selected Fetting as a candidate but backtracked after learning from OAG that Fetting had a conviction for "leaving-after-colliding."

### E. Miller Matter Referred to Internal Affairs

On December 14, 2010, as part of its investigation of the Young matter, IAD asked OAG for case files from arrests made by Zabavsky and Rodriguez during the prior two years, specifically files related to any female suspects who had given urine samples. With Assistant Deputy Attorney General Washington's permission, Criminal Section Chief M. Kimberly Brown emailed IAD a sexual harassment complaint stemming from the officers' 2009 arrest of Marissa Miller. Because the Miller matter involved a different complainant and did not involve a urine sample, it became a separate investigation.

### F. Zabavsky's Email to Chief Lanier

Two weeks later, Zabavsky emailed MPD Chief Cathy Lanier, seeking her assistance in "getting IAD to work on and complete the [Young] investigation," which was in its sixth month. Zabavsky reported that OAG had notified defense attorneys about the nature of the investigation, resulting in "all sorts of crazy accusation[s]" of evidence tampering against him. A few of his cases had been

dropped and many others had been continued indefinitely until the investigation was completed.

Zabavsky believed that the investigation was instigated by OAG "in retaliation for speaking the truth on the stand regarding the Intoxilyzer and Intoximeter situation," remarking that "[s]ome people over at the OAG's office would rather [officers] stay quite [*sic*] or even lie." Confident that the investigation would exonerate him of any wrongdoing, he asked Chief Lanier to assist in moving the process along.

### G.  Baumann's Letter to D.C. Officials

Appellants thereafter met with Kristopher Baumann, the Chairman of the Fraternal Order of Police ("FOP"). They explained how they had refused to limit their trial testimony about the Intoxilyzers and expressed concerns about what they believed to be retaliatory actions by OAG and MPD. On January 24, Baumann sent letters to the Attorney General, the Inspector General, and the Chairman of the D.C. Council Committee on Public Safety and the Judiciary. The letters detailed the officers' representations and requested that the Office of the Inspector General and the Council investigate OAG for ethical abuses and violations of law.

**H. Developments in the Young Matter**

On February 10, 2011, IAD interviewed Rodriguez in connection with the Young investigation. Rodriguez maintained that "he [had] asked Officer Rhonda Winters to witness the collection of Ms. Young's [urine] sample" and "watched Officer Winters observe[] the sample." However, "[Ms. Young] recalled going into the bathroom alone" and, according to Winters, at that time Rodriguez had never asked her to observe an arrestee giving a urine sample. The line prosecutor assigned to the Young case also reported that Rodriguez had previously admitted that he "allowed Ms. Young to go into the rest room alone."

Based on the conflicting reports, IAD concluded that Rodriguez had made a false statement in his interview and revoked his police powers pending trial board review. In its final investigative report, IAD recommended that the allegation of misconduct against Rodriguez be sustained and cleared Zabavsky of any wrongdoing.

**I. The Council Hearing**

On February 28, 2011, at 11:00 a.m., the Council of the District of Columbia held a public hearing on the District's response to the Intoxilyzer issue. At the hearing, Fetting testified that the District had mishandled its DWI program and had retaliated against him for refusing to lie in court. Rodriguez also testified, stating that OAG had disregarded ethical and judicial rules in its handling of the Miller matter.

Zabavsky did not testify before the Council. On the morning of the hearing, he was scheduled to testify in three trials. When Zabavsky arrived at Superior Court, he told the line prosecutor that he needed to testify before the Council at 10:00 a.m. The prosecutor said he knew and "would see what he could do." After securing two plea deals and a continuance, the prosecutor released Zabavsky at 12:30 p.m.

By the time Zabavsky arrived at the Council hearing, Rodriguez and Fetting had already testified. The Council had moved on to other topics, and FOP Chairman Baumann did not think that the Council would want to go back to allow Zabavsky to testify, so Zabavsky submitted a written statement in lieu of oral testimony. There, he expressed his belief that OAG and MPD had mishandled the

Intoxilyzer situation and requested that the Council take immediate action against OAG.

### J. Urine Sample Witnessed by Rodriguez

The following month, an OAG line prosecutor received an unusual toxicology report for a urine sample witnessed by Rodriguez. The concentration of alcohol in the sample was inconsistent with human urine, raising questions as to whether the sample had been adulterated. Section Chief Brown referred the matter to Deputy Attorney General Hildum, suggesting that IAD review it. Hildum referred the matter to IAD, which later issued a final investigative report finding insufficient facts to support the allegation of misconduct against Rodriguez.

### K. Resolution of the Miller and Young Matters

IAD eventually released a final report noting that Ms. Miller had failed to cooperate with its investigation and concluding that there were insufficient facts to support her sexual harassment complaint against Rodriguez and Zabavsky. In connection with the Young matter, MPD served Rodriguez with a notice of proposed adverse action recommending his termination. An MPD adverse action

panel later exonerated Rodriguez, finding insufficient evidence to sustain the charges against him.

## L. Superior Court Proceedings

Appellants filed a civil complaint in the Superior Court alleging that (1) after they made various protected disclosures and refused to comply with illegal orders, MPD and OAG took retaliatory actions against them; and (2) OAG had interfered with Zabavsky's right to furnish information to the Council. Appellants later filed a motion to amend their complaint, seeking to add an additional instance of alleged retaliation against Rodriguez. The trial court denied the motion, finding that the amendment would be futile.

The trial court thereafter granted appellees' motion for summary judgment, ruling that, based on the undisputed facts, no reasonable juror could find that (1) appellants had made protected disclosures, (2) OAG had asked appellants to comply with illegal orders, (3) appellees had taken prohibited retaliatory actions against appellants, or (4) OAG had interfered with Zabavsky's right to furnish information to the Council. This appeal followed.

### III.    Standard of Review

In our review of the trial court's order granting summary judgment, "we assess the record independently . . . [and view it] in the light most favorable to the party opposing the motion." *Wilburn v. District of Columbia*, 957 A.2d 921, 924 (D.C. 2008) (alteration in original) (citation omitted). We will affirm the ruling "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted).

### IV.    The Whistleblower Protection Act

To prove a WPA violation, a government employee must establish (1) that he was the subject of a prohibited personnel action (or was otherwise retaliated against) because he made a protected disclosure or refused to comply with an illegal order, or (2) that a person interfered with his right to furnish information to the Council. *See* D.C. Code § 1-615.53 (a)-(b).

An illegal order "means a directive to violate or to assist in violating a federal, state or local law, rule, or regulation." D.C. Code § 1-615.52 (a)(4) (2001). A protected disclosure is any disclosure of information by an employee

that the employee reasonably believes evidences, among other things, gross mismanagement, gross misuse or waste of public resources, a violation of law, or a "substantial and specific danger to the public health and safety." D.C. Code § 1-615.52 (a)(6) (defining "protected disclosure"). "A purely subjective perspective of an employee is not sufficient even if shared by other employees." *Zirkle v. District of Columbia*, 830 A.2d 1250, 1260 (D.C. 2003) (citation omitted). An employee's subjective belief is reasonable only if "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence [gross mismanagement, gross misuse of public resources, a violation of a law, or other official misconduct]." *Id.* at 1259-60.

## V. Claims of Gross Mismanagement

### A. Zabavsky's Email to Fellow MPD Officers

As an "FYI" to fellow officers, Zabavsky disclosed in a February 22 email that OAG would "no paper" DWI charges and proceed instead with DUI and OWI charges. According to appellants, this sharing of information disclosed gross mismanagement because the policy "prevented the OAG from . . . successfully

prosecuting [DWI] crimes." Zabavsky's email does disclose OAG's new policy, but it neither states nor implies that the policy "create[d] a substantial risk of significant adverse impact on [OAG's] ability to accomplish its mission." *District of Columbia v. Poindexter*, 104 A.3d 848, 855 (D.C. 2014) (quoting *Embree v. Dep't of Treasury*, 70 M.S.P.R. 79, 85 (1996)) (defining gross mismanagement). From the text of the email, there is no indication that Zabavsky subjectively believed that the policy was an example of gross mismanagement. *See Freeman v. District of Columbia*, 60 A.3d 1131, 1151 (D.C. 2012) ("[T]he plaintiff personally must have had . . . a belief [that his disclosure evidenced official misconduct] at the time the disclosure was made.").

Even if there were a genuine issue of material fact regarding whether the email disclosed Zabavsky's subjective belief that the policy would jeopardize OAG's ability to accomplish its mission, his belief would not have been reasonable given the circumstances. At least some of MPD's Intoxilyzers had been improperly calibrated and had reported inaccurate results, casting a cloud of suspicion over the District's program to combat impaired driving. To promote the integrity of the program and restore public confidence in the office, OAG exercised its prosecutorial discretion and chose to forgo new DWI prosecutions based on breath tests while it conducted a careful investigation of the problem. This policy

ensured that OAG's convictions were not the product of faulty breath testing but allowed OAG to continue safeguarding public safety by pursuing DUI and OWI charges.

Zabavsky argues that pursuing DUI and OWI convictions did not adequately ensure the public safety because, unlike some DWI convictions, they do not carry mandatory jail sentences and trigger reciprocal suspension in Virginia and Maryland. He therefore concludes that OAG's policy was an act of gross mismanagement, but he does not clearly and independently argue that his email disclosed a "substantial and specific danger to the public health and safety," a distinct class of protected disclosures under the WPA. *See* D.C. Code § 1-615.52 (a)(6)(E). Moreover, even if Zabavsky had raised this claim, it would fail for the same reasons that his gross mismanagement claim does.

Put otherwise, Zabavsky challenges whether OAG's charging decision was a sound exercise of prosecutorial discretion. But "[t]he WPA is not a weapon in arguments over policy . . . ." *Zirkle,* 830 A.2d at 1260 (citation omitted). "For there to be a protected disclosure, an employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people." *Wilburn*, 957 A.2d at 925 (citation omitted). On the

undisputed facts, where OAG continued to prosecute cases for DUI and OWI, no reasonable juror could conclude that OAG's policy decision not to pursue DWI charges until the Intoxilyzer investigation was completed created a "substantial and specific danger to the public health and safety" or constituted "gross mismanagement." D.C. Code § 1-615.52 (a)(6).

## B. Zabavsky's Email to Chief Lanier

Appellants next contend that Zabavsky reasonably believed that his email to Chief Lanier evidenced OAG's gross mismanagement because it disclosed that the Young "investigation was taking so long, it had the effect of causing 'quite a few' DUI cases to be dropped or continued." According to Zabavsky, to avoid providing the trial court and defense attorneys with specific details about the investigation, OAG elected to dismiss and continue cases involving him, "preventing the OAG from accomplishing its mission of prosecuting drunk driving cases." However, Zabavsky did not raise this theory of gross mismanagement in his email. His email attributed the dismissals and continuances to the dilatory pace of IAD's investigation.

Zabavsky wrote to Chief Lanier "with the hope that [she] could help out with speeding up [the Young] investigation." He explained that OAG had released a "one sentence statement" to defense attorneys notifying them about the investigation,[3] which had "started all sorts of crazy accusation[s] by the defense attorney's [*sic*]" that he and Rodriguez had "tampered with numerous urine samples" and "caused quite a few cases to be dropped and many other cases continued until [the] investigation [wa]s over." However, he did not assert that these things occurred because OAG refused to provide defense attorneys with more detailed information about the investigation. (Indeed, the factual investigation was still underway so OAG did not yet have a full explanation to give.) Zabavsky, instead, placed the blame on the length of IAD's investigation, noting that it "ha[d] been dragging on" for six months and remarking "how hard could it be to pick up the phone and call the defendant."

Because OAG and IAD are separate entities, Zabavsky's complaints about the pace of IAD's investigation cannot have disclosed gross mismanagement by OAG. Insofar as appellants challenge OAG's initial referral of the Young matter

---

[3] Zabavsky and Rodriguez were aware of the pending investigation, which arguably created a motive to "curry favor" with the government while testifying. Therefore, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), OAG was obliged to reveal the pending investigation to defense attorneys for impeachment purposes.

to IAD, that claim also fails. As the trial court noted, "it would be tantamount to dereliction of duty if [OAG] had swept [the Young] problem under the rug." The discrepancy between the officers' report and the toxicology results in the Young matter had potentially serious implications. Either the officers had violated MPD protocol requiring a female witness for the urine sample and falsely represented that they had secured a witness, or the officers had potential credibility issues "because they arrested somebody for DUI -- or DWI that they believed was drunk and [the toxicology test] came back .02," calling into question their assertions that Young appeared to be intoxicated. "If [OAG] didn't do anything," "[they] might [later] be accused of covering up a problem." Zabavsky himself conceded that he would want to know more about such a discrepancy, belying any contention that he subjectively believed that OAG's referral of the matter to IAD was itself an act of gross mismanagement.

**C. Baumann's Letters and Appellants' Testimony Before the Council**

To support their next claims, appellants repeatedly use the term "protected disclosure" but fail to identify any specific statement from either Baumann's

letters[4] or their Council testimony that supports a claim of gross mismanagement. *Hensley v. District of Columbia Dep't of Emp't Servs.*, 49 A.3d 1195, 1206 (D.C. 2012) ("We have held repeatedly that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citation omitted)). Our review of the letters and testimony has uncovered no such statements.[5]

## VI.    Gross Misuse of Public Resources

Appellants contend that OAG and MPD neglected to inform officers about the "no paper" policy, causing "officers [to waste] public resources by continually performing breath tests . . . that would never be used in the prosecution of any crimes." Because Zabavsky's February 22 email disclosed OAG's "no paper"

---

[4] Because Baumann authored, signed, and sent the letters, and it is not clear that appellants reviewed and approved them before they were sent, the parties dispute whether appellants may claim they are protected by any disclosures made therein. We assume but do not decide that the letters may be attributed to appellants because we nevertheless conclude that they are not protected disclosures.

[5] Appellants do specify that Baumann's letters and their Council testimony reported their refusals to limit their in-court testimony about Intoxilyzers. Those facts are material to their claims that they disclosed violations of law, which are addressed below in Section VII.

policy, appellants argue that it reported a gross misuse of public resources. It did not.

As mentioned above, Zabavsky's email characterizes his description of OAG's new "no paper" policy as an "FYI." It neither states nor implies that OAG withheld information about the policy and thereby caused officers to waste resources by needlessly conducting breath tests. Although the email does express frustration about "why MPD [was] keeping [officers] in the dark," it fails to state or imply that any misuse or waste of public resources resulted from MPD's silence. No reasonable juror could find that Zabavsky reasonably believed that his email disclosed what it neither stated nor implied. *See Freeman*, 60 A.3d at 1143 ("[A]n employee must have had such a [reasonable] belief *at the time the whistle was blown* in order to state a claim under the DCWPA." (emphasis in original)). And, as Judge Epstein aptly observed, "[i]t is absurd to contend that whenever an employee expresses frustration about the scope of information-sharing or the pace of decision-making in a large government organization, that employee becomes a whistleblower insulated to a significant degree from adverse personnel actions."

## VII. Violations of Law and Refusals to Comply With Illegal Orders

Appellants contend that "OAG attorneys were instructing [them] to lie on the witness stand" when they told appellants "to limit their testimony regarding the Intoxilyzers." Because appellants "refused to limit their testimony and lie under oath," they conclude that they not only made protected disclosures reporting violations of law, *see* D.C. Code §§ 1-615.52 (a)(6)(D), -615.53 (a), but also refused to comply with illegal orders, *see* D.C. Code §§ 1-615.52 (a)(4), -615.53 (a). They claim to have made additional protected disclosures about these violations of law in Zabavsky's email to Chief Lanier, Baumann's letters to District officials, and the testimony of Rodriguez and Fetting before the Council. We disagree.

Appellants concede that no prosecutor specifically instructed them to lie. The prosecutors said something to the effect of "[j]ust say you don't know," explaining that "it would be hearsay" for them to testify about the Intoxilyzer investigation because "[they're] not the ones who discovered the problem." Appellants make no claim that they actually had personal knowledge about the District's investigation of the Intoxilyzers. In Zabavsky's words, "[they] basically [had] heard how MPD was handling the investigation" from other officers.

Particularly in light of the disclosures that had been made to defense attorneys and to the public, no "disinterested observer," *see Zirkle*, 830 A.2d 1259-60, could conclude that appellants, who characterize themselves as "experienced trial witnesses who regularly testify in court," reasonably believed that the prosecutors' instructions to limit their testimony to first-hand observations suborned perjury. As the trial court pointed out, "OAG had a legitimate interest in making sure that (1) any information provided to defendants or the public at large about the problems with Intoxilyzers was accurate; (2) the results of the investigation would not be disclosed until the investigation was complete; and (3) any interim or final results of the investigation would be disclosed in an orderly and comprehensive way, and not on a piecemeal basis." Appellants' refusals to limit their testimony therefore could not have constituted protected disclosures of violations of law. Because the record contains no evidence of any actual suborning of perjury, we likewise hold that no reasonable juror could find that appellees directed appellants to violate the law, defeating appellants' claims that they refused to comply with an illegal order.[6]

---

[6] We do not decide whether the WPA requires that an employee have refused to comply with an order that is actually illegal or whether it is sufficient that the employee reasonably believed the order to be illegal because appellants have failed to present evidence of either a reasonable belief or actual illegality. *Compare* D.C. Code § 1-615.52 (a)(6) ("Protected disclosure means any disclosure of information . . . that the employee *reasonably believes* evidences . . . [a]

(continued…)

## VIII.  Appellants' Motion to Amend

Appellants have failed to present evidence sufficient to establish that they made any protected disclosures or refused to comply with any illegal orders, defeating their retaliation-based WPA claims.  *See* D.C. Code § 1-615.53 (a). Because appellants' motion for leave to amend their complaint did not seek to allege any additional protected disclosures or refusals to comply with illegal orders, but instead only sought to allege an additional instance of retaliation, we affirm the trial court's finding that the amendment would have been futile.

## IX.    Interference With the Right to Furnish Information

The parties do not dispute the trial court's ruling that the WPA prohibits *a supervisor* from unreasonably interfering with an employee's right to furnish information to the Council.  *See* D.C. Code § 1-615.53 (b).  The heart of their disagreement is whether, by keeping Zabavsky in court and delaying his arrival at

---

(…continued)
violation of a federal, state, or local law, rule, or regulation." (emphasis added)), *with* D.C. Code § 1-615.52 (a)(4) ("Illegal order means a directive to violate or to assist in violating a federal, state or local law, rule, or regulation.").

the public hearing, an OAG line prosecutor unreasonably interfered with Zabavsky's right. Applying well-accepted canons of statutory construction, we adopt the trial court's interpretation of D.C. Code § 1-615.53 (b) and affirm its finding that the prosecutor did not unreasonably interfere with Zabavsky's right.

## A. Statutory Interpretation

"The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *District of Columbia v. Reid*, 104 A.3d 859, 867 (D.C. 2014) (citation omitted). We "first look at the language of the statute by itself to see if the language is plain and admits of no more than one meaning." *Dobyns v. United States*, 30 A.3d 155, 159 (D.C. 2011) (citation omitted). We "may appropriately look beyond plain meaning, however, where . . . the literal meaning of the statute produces absurd results." *Id.* (citation omitted).

The text of D.C. Code § 1-615.53 (b) states, in pertinent part, that "a person shall not interfere with or deny the right of employees, individually or collectively, to furnish information to the Council." Interference means "[a]n obstruction or hindrance." *Black's Law Dictionary* 937 (10th ed. 2014). By logical extension, to

interfere means to obstruct or to hinder. By its plain meaning, therefore, the provision prohibits any person from obstructing, hindering, or denying an employee's right to furnish information to the Council, without reference to the circumstances surrounding the obstruction, hindrance, or denial. If interpreted literally, it would, for example, reach an MPD officer who blocks traffic for safety reasons and inadvertently prevents a District employee from testifying at a public hearing before the Council. It might also reach a trial judge who insists that a detective who was a crucial witness in a murder trial complete his testimony before going to testify before the Council.

To avoid such absurd results, we examine the provision's legislative history. Section 1-615.53 (b) was enacted to ensure that "supervisors cannot interfere with communications to the Council." D.C. Council, Report on Bill 18-233 at 9 (Nov. 19, 2009). The overarching purpose of the WPA is to "[e]nhance the rights of District employees to challenge the actions or failures of their agencies . . . without fear of retaliation" and to "[g]uarantee the rights of employees to contact and communicate with the Council." D.C. Code § 1-615.51. In light of these purposes, we agree with Judge Epstein's conclusion that the statute applies "only

when a supervisor [7] interferes with an employee's right to provide information to the Council" and that it "prohibits only unjustified and unreasonable interference."

## B. Application

Appellants concede that Zabavsky knew he was scheduled to testify both before the Council and in three trials on the morning of February 28 but did not follow "the normal process to notify the prosecutor[]" of his continuance request by email. Zabavsky instead waited until the day of trial to tell the prosecutor of his scheduling conflict. Because the court might reject the plea agreements or the defendants might balk at entering their pleas, thus forcing the case to trial, the prosecutor retained his witness until the court accepted two plea agreements and granted a continuance in his third case.

Notwithstanding these facts, appellants contend that whether the prosecutor acted reasonably was a disputed issue because it was not unusual for officers to seek continuances on the day of trial and the record supports an inference that the

---

[7] The trial court assumed, without deciding, that the prosecutor qualified as a supervisor. We, however, doubt that a line prosecutor employed by OAG "has the authority to effectively recommend or take remedial or corrective action" against an officer employed by MPD. *See* D.C. Code § 1-615.52 (a)(8) (defining supervisor).

prosecutor knew, in advance, that Zabavsky wanted to testify before the Council. Appellants also emphasize that Zabavsky's absence would not have jeopardized the prosecutions because the prosecutor resolved the matters short of trial.

But even if there were a jury question whether the prosecutor acted justifiably, he did not in fact prevent Zabavsky from exercising his § 1-615.53 (b) right. According to Zabavsky's undisputed deposition testimony, he arrived at the hearing before it concluded but did not request to testify. At Baumann's suggestion, he chose instead to submit a written statement because Rodriguez and Fetting had already testified and the Council had moved on to other topics. In that written statement, he alleged with great detail that OAG and MPD had mishandled the Intoxilyzer situation and requested that the Council take immediate action. Under these circumstances, the prosecutor neither denied nor unreasonably interfered with Zabavsky's right to furnish information to the Council.

In light of our holding, we do not reach the trial court's alternative finding that the prosecutor's actions were protected by immunity. Likewise, because we hold that appellants did not make protected disclosures and did not refuse to obey illegal orders, we do not address the trial court's finding that appellants failed to

present evidence sufficient to "support an inference that any individual defendant retaliated against any plaintiff" for engaging in conduct protected by the WPA.

## X.    Conclusion

In sum, we reject appellants' arguments that the trial court usurped the fact-finding role of the jury.  Appellants did not meet the legal standards required to establish a violation of the WPA.  *Cf. Poindexter*, 104 A.3d at 859 (jury verdict in favor of plaintiff overturned "because appellee's evidence failed to show that she made a 'protected disclosure' on any basis"); *Freeman*, 60 A.3d at 1154 (judgment for plaintiff vacated on appeal; "as a matter of law" plaintiff did not prove that he made a protected disclosure).  For the foregoing reasons, we affirm the judgment of the Superior Court.