*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CV-0777

TROY STEWART, APPELLANT,

V.

DISTRICT OF COLUMBIA, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2016-CA-002821-B)

(Hon. Florence Y. Pan, Motion Judge)

(Argued December 4, 2019     Decided March 16, 2023)

*Kirk R. Ruthenburg*, with whom *Daniel Morris* and *Matthew A. Lafferman*, were on the brief, for appellant.

*Sarah L. Knapp*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia at the time of argument, *Loren AliKhan*, Solicitor General at the time of argument, *Caroline S. Van Zile*, Deputy Solicitor General, and *Lewis Preston*, Assistant Attorney General, were on the brief, for appellees.

Before BECKWITH, *Associate Judge*, and RUIZ and THOMPSON,[*] *Senior Judges*.

Opinion of the court PER CURIAM.

Opinion by *Senior Judge* THOMPSON, dissenting in part, at page 21.

---

[*] Senior Judge Thompson was an Associate Judge of the court at the time of argument. On February 18, 2022, she began her service as a Senior Judge.

PER CURIAM: Plaintiff/appellant, Troy Stewart, a former correctional officer employed by the District of Columbia Department of Corrections (DOC), argues that the trial court erred in granting summary judgment in favor of defendants/appellees, District of Columbia and Major Joseph Pettiford, on Mr. Stewart's District of Columbia Whistleblower Protection Act (DCWPA) claim.[1] For the reasons that follow, we affirm in part and reverse in part.

## I. Background

Appellant's DCWPA claim involves two correctional officer/inmate interactions that took place at the D.C. Jail Northwest II housing unit on April 10, 2015, and two incident reports made the same day. At the time, appellant was a probationary correctional officer, and Major Pettiford was part of DOC's senior management at the jail. Appellant was assigned to the Northwest II unit along with Corporal (Cpl.) Pablo Rodriguez,[2] who was in command, and Cpl. Jonathan Evans.

According to the complaint, on the day in question, Rodriguez assigned appellant and Evans to conduct an inmate count while the inmates were on

---

[1] *See* D.C. Code §§ 1-615.51 to -615.59.

[2] Rodriguez's surname also appears in the record as "Rodriquez."

lockdown. While conducting the count, appellant and Evans worked from opposite ends of a hallway (or tier) of cells and converged near Cell 71, where they both stopped and observed that the inmate in Cell 71 had covered the cell's window with a sheet, such that he could not be seen. Evans instructed the inmate to remove the sheet, but the inmate refused. Evans asked Rodriguez, who was in the Northwest II guard station—a monitoring station known as "the Bubble," where correctional officers can observe activities throughout the unit—to give him access to Cell 71 electronically.

Once the cell door was opened and Evans had removed the sheet, appellant stepped away from the cell to resume his inmate count. Appellant alleges that he then "heard a loud noise," "turned around," "saw a piece of orange jumpsuit," and "saw [the inmate] in the cell and the cell door closing." Security camera footage shows that the inmate had partially emerged from his cell and scuffled momentarily with Evans before being pushed back inside. Appellant contends that he did not see the physical struggle, but only saw and assisted Evans's effort to close the cell door.

When the cell door closed, appellant continued walking along the tier and resumed counting. Security camera footage shows that as appellant faced away from Cell 71, Evans thrust his clipboard into the horizontal food slot of the door to Cell

71. Appellant contends that he did not see Evans put his clipboard into the slot, but that he heard yelling coming from Cell 71. Appellant walked back towards the cell, found that the inmate was "babbling," and determined that Evans was arguing with the inmate. Appellant alleges that when he told Evans to disengage with the inmate, Evans ordered him to proceed with his inmate count. Appellant complied.[3] The surveillance video shows that while appellant was still near the door to Cell 71, the inmate threw liquid from the toilet at appellant through the slot in the cell door.

When appellant completed his inmate count, he returned to the Bubble and told Rodriguez, three times, that the inmate was "down there babbling about something" and that Rodriguez "need[ed] to check on the welfare" of the inmate because "something [was] wrong down there." Appellant also told Rodriguez that "Evans don't [sic] want me down there."

After visiting Cell 71 and observing that the inmate's lip was bleeding, Rodriguez took the inmate to the infirmary. Both appellant and Evans were instructed to complete incident report (DCDC-1) forms. In the report that he submitted, appellant wrote the following:

---

[3] Appellant asserts that DOC rules required him to "strictly comply with the order of a superior."

> On, 4/10/15 at approximately 3:15 PM, I OFC Stewart was assigned to NW #2 Housing Unit. As I OFC Stewart was doing the count I notice [sic] Cpl. J. Evans was talk [sic] to inmate . . . then I walk [sic] over to cell 71. And inmate [name redacted] was talking [sic] very high voice. Then Cpl. J. Evans told me to keep counting its [sic] ok. I did the count and went to the bubble. And then Cpl. Rodriguez went to cell 71 . . . and took [the inmate] to the infirmary.

In response to the form's question, "[i]f force was used, describe type (i.e. physical, chemical agent, baton, etc.)," appellant responded "No." In response to the form's directive to "[d]escribe injuries to staff or inmate," appellant responded "N/A."

After reviewing appellant's incident report, Lieutenant MaRion Boyd ordered appellant to go with him to Major Pettiford's office. Appellant's complaint alleges that after reviewing appellant's incident report, Pettiford told appellant "to change material facts in his incident report" because "[t]his kind of statement can make you lose your job." Appellant testified during his deposition that Pettiford, a minute after being handed appellant's just-completed written report, confronted him, saying, "You're going against a man that's been here 20 years, Evans? This f****n' report will get you fired. I want it changed."[4] Appellant asserts that he understood Pettiford to be asking him to falsify his report, presumably in order to protect Evans.

---

[4] Pettiford claims that he called appellant into his office to discuss "the importance of submitting factual reports."

Appellant testified in his deposition that he refused to do so and told Pettiford, "That's my report and that's what I saw." Appellant's complaint further alleges that Boyd told him that the Deputy Warden wanted appellant to change his report.

On April 15, 2015, Pettiford submitted a memorandum to Warden William Smith and Deputy Warden Lennard Johnson. Pettiford recommended that appellant "not be retained past his [p]robationary [p]eriod and that he be immediately removed from his position" because of appellant's: (1) denial that he witnessed interactions between the inmate and Evans (even after he was allowed to view the video surveillance footage), (2) refusal to submit a factual report, (3) lack of integrity, and (4) "willingness to hide behind the so called 'thin blue line.'" Warden Smith recommended to DOC Director Thomas Faust that he terminate appellant's probationary employment because appellant "wasn't being truthful about the situation." After reviewing the Warden's recommendation and supporting documentation, Faust accepted the recommendation. Appellant was terminated on April 22, 2015.

On April 14, 2016, appellant filed a complaint against the District and Pettiford alleging retaliatory discharge in violation of the DCWPA. Appellant alleged—either in his complaint or in his supplemental interrogatory responses—

that he was terminated in retaliation for his: (1) verbal disclosure of the Cell 71 inmate's condition after his interaction with Evans, (2) written report relating to the same incident, and (3) refusal to comply with an illegal order to falsify his incident report and thereby assist in an attempted cover-up of Evans's misconduct.[5] The District moved for summary judgment, arguing that appellant did not make any disclosure protected under the DCWPA. The District also argued that, even if appellant had made protected disclosures, no disinterested observer viewing the surveillance video could conclude that appellant—who failed to submit a complete report and refused to supplement his report when asked to do so—refused to comply with an illegal order because correctional officers are required to submit accurate reports of any significant events such as confrontations or use of force that they observe or are aware of within the facility.

The trial court entered summary judgment in favor of appellees. The court found that appellant's evidence was insufficient as a matter of law to establish DCWPA violations. Appellant contends that the trial court erred in granting summary judgment because his verbal and written reports constituted DCWPA-

---

[5] Appellant's complaint also included a count alleging wrongful termination in violation of public policy. The trial court dismissed that count for failure to state a claim, and appellant has not challenged that ruling.

protected disclosures and because there is a genuine dispute of material fact as to what he saw and whether Pettiford ordered him to falsify his report.

## II. Legal Standard

In reviewing a grant of summary judgment, we view "the record in the light most favorable to the non-moving party, drawing all reasonable inferences from the evidence in the non-moving party's favor." *Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011). Our review is de novo, and we will affirm the judgment only if there is no genuine issue of material fact and the evidence entitles the moving party to judgment as a matter of law. *Id.* Generally that means that if opposing parties present contradictory evidence about a material fact, summary judgment is not proper because questions of credibility are resolved by the finder of fact. *See Samm v. Martin*, 940 A.2d 138, 141 (D.C. 2007). The usual resort to the factfinder is not necessary, however, and summary judgment is proper, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Evidence satisfying this "rarely" met standard includes "a video tape that 'quite clearly' demonstrates the falsity of [a] statement." *Robinson v. Pezzat*, 818 F.3d 1, 10 (D.C. Cir. 2016) (quoting *Scott*, 550 U.S. at 378); *see also, e.g., Franklin v.*

*Blackman*, No. 13-CV-470, 2014 WL 6685950, at \*6 (N.D. Ill. Nov. 25, 2014) (noting that "*Scott*'s standard is exceptionally high").

### III. District of Columbia Whistleblower Protection Act

The DCWPA's premise is that "the public interest is served when employees of the District government are free to report waste, fraud, abuse of authority, violations of law, or threats to public health or safety without fear of retaliation or reprisal." D.C. Code § 1-615.51. To establish a prima facie case for retaliation under the DCWPA, a plaintiff must show that he "made a protected disclosure, that a supervisor retaliated or took or threatened to take a prohibited personnel action against h[im], and that h[is] protected disclosure was a contributing factor to the retaliation or prohibited personnel action." *Wilburn v. District of Columbia*, 957 A.2d 921, 924 (D.C. 2008).

A protected disclosure is

> any disclosure of information . . . by an employee to a supervisor or a public body that the employee reasonably believes evidences . . . [a]buse of authority in connection with the administration of a public program . . . [or a] violation of federal, state, or local law, rule or regulation.[6]

---

[6] Under D.C. Code § 1-615.52(a)(6), a protected disclosure must concern:

D.C. Code § 1-615.52(a)(6). "Abuse of authority occurs when there is an arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or that results in personal gain or advantage to himself or to preferred other persons." *District of Columbia v. Poindexter*, 104 A.3d 848, 857 (D.C. 2014) (quoting *Embree v. Dep't of Treasury*, 70 M.S.P.R. 79, 85 (1996)). An employee's disclosure is protected only "if it reveals 'such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people.'" *Williams v. Johnson*, 776 F.3d 865, 870 (D.C. Cir. 2015) (quoting *Wilburn*, 957 A.2d at 925). The putative whistleblower must show "not just his subjective belief that the information set forth evidenced official misconduct, but also the objective reasonableness . . . [of] that belief." *Freeman v. District of Columbia*, 60 A.3d 1131, 1151 (D.C. 2012). That belief must have been held "at the time the disclosure was made." *Id.*; *cf. Holbrook v. District of Columbia*,

---

(A)  Gross mismanagement;

(B)  Gross misuse or waste of public resources or funds;

(C)  Abuse of authority in connection with the administration of a public program or the execution of a public contract;

(D)  A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or

(E)  A substantial and specific danger to the public health and safety.

259 A.3d 78, 89 & n.8 (D.C. 2021) (clarifying that we do not consider "after-the-fact characterizations" of what a whistleblowing employee "believed their objections conveyed" when the "employee's contemporaneous disclosure betrayed no hint of wrongdoing"). The DCWPA also protects against retaliation for a refusal to comply with an illegal order, which is defined as "a directive to violate or to assist in violating a federal, state or local law, rule, or regulation." *Rodriguez v. District of Columbia*, 124 A.3d 134, 142 (D.C. 2015) (quoting D.C. Code § 1-615.52(a)(4) (2001)).

## IV. Whether Appellant Made a Prima Facie Showing That He Made Protected Disclosures

Appellant contends that his verbal report to Rodriguez that something was wrong with the inmate in Cell 71 and that Evans did not "want him down there" along with his verbal request for Rodriguez to check on the welfare of the inmate, constituted protected disclosures. The District argues that appellant's verbal statements to Rodriguez were not protected disclosures.

We agree with the trial court that appellant's verbal report did not apprise Rodriguez of a "serious agency error" or abuse of authority. There is a fair inference that appellant's request for a check on the inmate's welfare indicated that the inmate

was in some kind of distress. However, appellant's verbal report did not say what had caused the inmate to be in distress and whether and how Evans—or anyone else—had caused or responded to such distress. The verbal report did not "disclose such serious errors . . . that a conclusion the agency erred is not debatable among reasonable people." *Wilburn*, 957 A.2d at 925 (quoting *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)). Accordingly, we conclude that appellant's verbal report to Rodriguez was not a protected disclosure under the DCWPA.

Appellant also contends that his written DCDC-1 report, specifically his disclosure of Evans's order that appellant should "keep counting it[']s ok," was protected under the DCWPA because it evinced Evans's abuse of authority in directing appellant to violate DOC's purported de-escalation policy requiring that a second correctional officer step in when there is a confrontation between an officer and an inmate.[7]

---

[7] The District disputes that the DOC policy exists. Appellant has not shown that the purported policy is memorialized in writing anywhere, but he points to the deposition testimony of Warden Smith, who, when asked whether there was such a policy, stated that when "one officer has a negative interaction with [an] inmate, the second officer should at least pay attention to what's going on as a witness and probably to intercede to either deescalate, or, if needed, provide assistance if it escalates out of control."

We agree with the trial court that what appellant wrote in his DCDC-1 report "cannot carry th[e] weight" appellant now assigns to it because, like appellant's verbal statements to Rodriguez, the order to "keep counting it's ok" while Evans talked to the inmate who was speaking in a "very high voice" does not reveal serious agency errors. As the trial court put it, "[t]he report, on its face, does not accuse Corporal Evans of wrong-doing."[8] During his deposition, appellant essentially agreed, testifying that he did not know whether what he wrote in his DCDC-1 report was "damaging [to or about Evans] or not." The scant report suggests that an inmate needed assistance, but not that his condition was the result of a serious agency error. And it shows that, in response, Rodriguez rendered assistance to the inmate by going to his cell and taking him to the infirmary.

---

[8] The issue of whether appellant made a protected disclosure might be a closer question if appellant had written in the DCDC-1 report what his complaint alleges he wrote. Appellant averred in paragraph 21 of the complaint that what he wrote "disclosed that Evans had, in violation of department policy, remained in the cell of the inmate" and "ordered Stewart to leave when Stewart returned to the cell after hearing a verbal altercation." But the record shows that what appellant actually wrote disclosed nothing about Evans having remained in the cell, an altercation with the inmate, or a violation of department policy. *See supra* at 5; *cf., e.g.*, *Maine v. Dep't of Corr.*, 845 S.E.2d 736, 713 (Ga. Ct. App. 2020) (concluding that a letter, which plaintiff claimed disclosed his superiors' failure to adhere to a policy requiring written authorization to give cell phones to inmates, "did not mention a lack of written authorization at all" and thus did not qualify as a protected disclosure).

Summary judgment was appropriate with respect to appellant's DCWPA claims based on alleged protected disclosures.

## V. Whether Appellant Made a Prima Facie Showing of Refusal to Obey an Illegal Order

We come to a different conclusion regarding appellant's allegation that Pettiford's demand that appellant change his DCDC-1 report was an illegal order that appellant refused to follow. The trial court found that the surveillance video contradicts what appellant wrote in his report and thus shows unequivocally that the report was, as the District contends, incomplete and inaccurate, and required supplementation. Specifically, the trial court found that the video shows that appellant "clearly witnessed" the incident in which Evans "pushed the inmate back into the cell, engaging in a brief struggle with the inmate." The trial court determined that "the complete lack of ambiguity in the videotape dispel[ed] any factual dispute" that appellant actually witnessed the incident. The trial court further found that given the "unequivocal[]" proof that appellant witnessed the physical altercation but failed to mention it in his report, no jury "could reasonably conclude that Major Pettiford's request that [appellant] supplement or change [his] report was an illegal order or a violation of DOC policy." Thus, the trial court concluded there was "no genuine

dispute that [appellant]'s refusal to alter or supplement his report was not" DCWPA-protected conduct.

Having viewed the surveillance video and the still images from the video that the District attached to its motion for summary judgment, we agree with the trial court that the surveillance video shows that appellant observed at least some of the first incident involving a physical altercation between Evans and the inmate. Although the view is obstructed because Evans is positioned between appellant and the video camera at the moment when the inmate can be seen emerging from his cell, the video shows appellant standing right next to Evans and appellant's feet pointing toward the cell during the struggle between Evans and the inmate at the entrance to the cell.[9]

Additionally, the video and still images unambiguously show appellant's interaction with the inmate after the clipboard incident, when the inmate threw a foul liquid at appellant. The District cited as undisputed material facts that appellant

---

[9] We acknowledge Boyd's deposition testimony—which appellant emphasizes—that he could not "from this distance" tell from the video what appellant could see during the incident. Boyd's "from this distance" remark is not explained. That said, during the deposition Boyd was not asked to review the still images, which show clearly that appellant (unless he was standing at the cell with eyes closed) could not have missed seeing the physical skirmish between the inmate and Evans at the cell door.

returned to Cell 71 and interacted with the inmate for about fifteen seconds after that incident based on the video and still-image evidence. From this evidence, the District argued that appellant undisputedly was aware that Evans had injured the inmate, but tried to cover up Evans's actions by omitting that information and by refusing to supplement his written report when asked to do so, even though he was required by DOC policy to timely report any "significant incident [such as a physical or verbal confrontation] through the appropriate chain of command."

We agree that there is unambiguous evidence that appellant failed to disclose all that he knew about the incidents of April 10, 2015. For example, appellant's complaint alleges that after he had completed his written report, and before he met with Pettiford, he heard Evans tell Rodriguez that Evans hit the inmate in the mouth with a clipboard, because Evans "just felt like hitting him." But appellant did not amend his DCDC-1 form to report this, even though DOC policy requires a correctional officer to submit accurate reports of any significant event or extraordinary occurrence that he or she "is directly involved in, witness[es,] or becomes aware of." We disagree, however, that the record unambiguously establishes that appellant knew the inmate had been injured during the clipboard incident. The angle of the still images and video does not show appellant's

viewpoint, and it is unclear whether the inmate's injured mouth was visible to appellant while appellant was looking through the cell window.

Regardless of the omissions in appellant's report or his failure to supplement it as he acquired additional information, the relevant question at the preliminary prima facie stage of a DCWPA claim is what Pettiford ordered appellant to do. If it were undisputed that Pettiford told appellant to only report everything that appellant observed related to the altercations with the inmate, and there was no reason for appellant to think otherwise, there would be no prima facie showing of refusal to obey an unlawful order. But that is not the situation here, as there is a genuine issue of material fact as to whether Pettiford asked appellant to change the report to protect Evans.

Appellant testified that Pettiford attempted to cover up the incident by threatening appellant that "going against a man that's been here 20 years" would "get [appellant] fired."[10] The trial court concluded that appellant's "allegations about his conversations with Major Pettiford do not create any genuine dispute of

---

[10] As noted above, the complaint alleges that Pettiford told appellant "to change material facts in his incident report" because "[t]his kind of statement can make you lose your [] job." (alteration in original). We also note that the record contains a memorandum in which Pettiford stated that Evans had been "employed with the agency for 32 [not 20] years."

material fact" because this allegation is "unsupported by the evidence, even when that evidence is viewed in the light most favorable to [appellant]." Specifically, the trial court reasoned that appellant's "report, on its face, does not accuse Corporal Evans of wrong-doing."

We disagree with the trial court's conclusion that appellant's testimony does not create a genuine issue of material fact because it is uncorroborated. "Even standing alone, self-serving testimony can suffice to prevent summary judgment." *Greer v. City of Wichita*, 943 F.3d 1320, 1325 (10th Cir. 2019); *accord Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020). The trial court may not make credibility determinations at the summary judgment stage. *See Katz v. District of Columbia*, 285 A.3d 1289, 1301 (D.C. 2022). To be sure, there is a narrow exception to the general rule: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)); *see also, e.g.*, *In re Buescher*, 783 F.3d 302, 308 (5th Cir. 2015) ("[A] party's uncorroborated self-serving testimony cannot prevent summary judgment, particularly if the overwhelming documentary evidence supports the opposite scenario." (quoting *Vinewood Cap., LLC v. Dar Al-Maal Al-Islami Tr.*, 541 F. App'x

443, 447-48 (5th Cir. 2013) (per curiam))). Here, there is evidence going both ways such that the factfinder would have to engage in its assigned role of making credibility determinations and weighing the evidence.

Some evidence contradicts appellant's testimony that Pettiford ordered him to change his report because he wanted to protect Evans. As the trial court noted, appellant's written report did not accuse Evans of wrongdoing. Pettiford himself did so in an April 17, 2015, "Extraordinary Occurrence Report Staff on Inmate Staff Assault Northwest Two" memorandum noting that Evans "assaulted [the i]nmate . . . by striking him in the face with a clipboard."[11] Pettiford's April 15, 2015, memorandum also details Evans's actions. And, on August 5, 2015, Pettiford issued a "Final Decision" letter that disciplined Evans for the clipboard incident, suspending him for five days without pay.

This contradictory evidence does not, however, render appellant's version of what Pettiford ordered him to do "totally implausible" or "demonstrably false." *Davis*, 951 F.3d at 750. This is so for three reasons. First, the evidence shows Pettiford was terminated for lying and falsifying documents related to a cell block

---

[11] Rodriguez also reported Evans's use of physical force against an inmate in his incident report.

audit. Second, Pettiford's "Final Decision" letter does not indicate that Evans assaulted the inmate with the clipboard as did his earlier reports; instead, it states that Evans "did not exercise due diligence which led to the subsequent assaults on [Evans], [appellant,] as well as the inmate." This letter led to a five-day suspension. Evans would have potentially faced a more serious punishment, such as termination, had the letter indicated that Evans assaulted the inmate. *Cf. McCormick v. District of Columbia*, 752 F.3d 980, 983 (D.C. Cir. 2014) (noting that the D.C. DOC director "terminated [the correctional officer] because Internal Affairs had concluded that [the officer] had assaulted a handcuffed inmate"). Last, when Rodriguez submitted his initial report, it identified Evans as using physical force against an inmate and included the word "clipboard" under the "Descriptions of Weapons" heading. But Rodriguez later signed and submitted a revised report—written by a different employee, Lieutenant Sandra Griffin—that changed his response under this heading to "None." Viewed in the context of Pettiford's own termination for lying and falsifying documents, the change in Rodriguez's report and the altered, lesser ground for suspending Evans in Pettiford's final report, lend credence to appellant's assertion that Pettiford wanted appellant to change his report in order to protect Evans. We cannot say that the record taken as a whole could not lead a rational trier of fact to find that Pettiford ordered appellant to change his report to cover up or minimize the incident. The factfinder may or may not credit appellant's version of

events.[12]  But viewing the evidence in the light most favorable to appellant as the nonmoving party, at this point it is a material fact genuinely in dispute and summary judgment was improper.

For the foregoing reasons, we affirm in part and reverse in part.  We affirm the trial court's grant of summary judgment with respect to the claims that appellant made protected disclosures.  We reverse the trial court's grant of summary judgment in favor of the District and Major Pettiford on appellant's DCWPA claim based on refusal to follow an unlawful order and remand for further proceedings consistent with this opinion.

*So ordered.*

THOMPSON, *Senior Judge,* dissenting in part: I dissent from my colleagues' determination to reverse the grant of summary judgment with respect to

---

[12] We note that in *Rodriguez* we left open the question of whether the DCWPA "requires that an employee have refused to comply with an order that is actually illegal or whether it is sufficient that the employee reasonably believed the order to be illegal because [the] appellants failed to present evidence of either a reasonable belief or actual illegality."  124 A.3d at 145 n.6.  We need not resolve that question here because it is undisputed that if Pettiford ordered appellant to change or falsify his report to cover up Evans's actions, that would be an illegal order in violation of DOC policy.  *See* D.C. Code § 1-615.52(a)(6)(D).

Mr. Stewart's claim that Major Pettiford caused him to be terminated for refusing to comply with an unlawful order – specifically, for refusing to change his April 10, 2015, written report. According to Mr. Stewart, Major Pettiford ordered him to change the report so as not to "go[] against a man [Cpl. Evans] that's been here 20 years." There is to be sure a factual dispute between the parties about whether Major Pettiford actually gave that order, as Mr. Stewart claims. But, as the Superior Court found, Mr. Stewart's April 10, 2015, report "on its face, does not accuse Corporal Evans of wrong-doing."[1] That undisputed fact brings Mr. Stewart's claim under the rule recognized by *Scott v. Harris*, 550 U.S. 372 (2007): that the usual resort to the factfinder to resolve issues of fact is not necessary, and summary judgment is proper, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it."[2] *Id.* at 380.

---

[1] As my colleagues acknowledge, Mr. Stewart's report disclosed nothing about Cpl. Evans having remained in the inmate's cell, about an altercation with the inmate, or about a violation of Department of Corrections policy. *Ante*, at 14 n.8.

[2] As my colleagues note, *ante* at 18 n.10, the record contains a memorandum in which Major Pettiford stated that Cpl. Evans had been "employed with the agency for 32 years," not 20 years as Mr. Stewart referenced in his claim about the change in his report that Major Pettiford ordered Mr. Stewart to make. That discrepancy casts doubt on the credibility of Mr. Stewart's account, as does the record evidence of Major Pettiford's April 17, 2015, memorandum that went against Evans by reporting his assault on the inmate by striking him in the face with a clipboard and Major Pettiford's April 15, 2015, memorandum criticizing Cpl. Evans for bragging about his antics in the inmate's cell.

Mr. Stewart's claim that Major Pettiford wanted Mr. Stewart's written report changed to protect Corporal Evans is unsupported by the evidence, even when the record evidence is viewed in the light most favorable to Mr. Stewart. Thus, this case is one "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [such that] there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted). It is one of those "rare[]" cases in which the documentary record "quite clearly demonstrates the falsity" of the claim. *Robinson v. Pezzat*, 818 F.3d 1, 10 (D.C. Cir. 2016) (internal quotation marks omitted). I would therefore affirm in full the judgment of the Superior Court.

---

But the issue at summary judgment is not the credibility of the competing witnesses. My point is that upon review of the Mr. Stewart's written report, which Mr. Stewart claims was the immediate trigger for Major Pettiford's allegedly unlawful order, no reasonable juror could conclude that Major Pettiford ordered Mr. Stewart to change his (innocuous) report so as not to "go[] against" Cpl. Evans.