# United States Court of Appeals for the Federal Circuit

04-3045

JOHN E. WHITE,

Petitioner,

v.

DEPARTMENT OF THE AIR FORCE,

Respondent.

Joanne Royce, Government Accountability Project, of Washington, DC, argued for petitioner. Of counsel was Richard Segerblom, Richard Segerblom, Ltd., of Las Vegas, Nevada.

Gerald M. Alexander, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Todd M. Hughes, Assistant Director.

Appealed from:   United States Merit Systems Protection Board

# United States Court of Appeals for the Federal Circuit

04-3045

JOHN E. WHITE,

Petitioner,

v.

DEPARTMENT OF THE AIR FORCE,

Respondent.

_____

DECIDED:  December 15, 2004
_____

Before MAYER, <u>Chief Judge</u>, LOURIE and DYK, <u>Circuit Judges</u>.

DYK, <u>Circuit Judge</u>.

Petitioner John E. White ("White") petitions for review of the final decision of the Merit Systems Protection Board ("Board"), which rejected his whistleblowing claim, finding that White did not have a reasonable belief that he was disclosing gross mismanagement.  <u>White v. Dep't of the Air Force</u>, No. DE-1221920491-M-4 (M.S.P.B. Sept. 11, 2003).  We affirm.

## BACKGROUND

White was employed by the Department of the Air Force ("Air Force") as a civilian Supervisory Education Service Specialist at Nellis Air Force Base in Nevada.  As part of his duties, White was delegated complete responsibility for administering off-duty education programs at Nellis Air Force Base.

In 1991 and early 1992, the Air Force was developing the "Bright Flag Quality Education System" ("QES"), a program which mandated various standards for colleges and universities contracting with the Air Force to provide education services. As the Board found, the QES program

> imposed various requirements on the educational institutions providing services on agency bases, and set forth ways to measure the institutions' compliance with the standards. The requirements pertained to faculty prerequisites, compilation of statistical data monitoring the effectiveness of the on-base educational programs, minimum classroom contact hours, compatible computer systems, mathematical and English placement testing to determine enrollment levels, course duplication, course evaluations to maintain quality, and adequate library resources to support the courses and programs.

White v. Dep't of the Air Force, 95 M.S.P.R. 1, 12 (2003) ("White V"). From September 1991 onwards, White discussed the QES program with various educational institutions that provided services to the Air Force and received a number of complaints from these institutions criticizing the QES program. Among the complaints from educational institutions were that the QES program duplicated regional accrediting, was academically unsound, necessitated excessive administrative burdens, and imposed excessive costs. There were also procedural objections that the Air Force had developed the program too quickly, without sufficient notice and input from the schools, and without conducting a cost-benefit analysis. White relayed these concerns to the Air Force in February 1992, but no action was taken at that time.

Frustrated by lack of attention to their concerns, several educational institutions requested a meeting with Air Force officials. A meeting was convened in the May of 1992. White was present at the meeting along with other Air Force officials. White repeated the criticisms of the QES program, arguing that the standards were being

imposed too rigidly, were academically unsound, and were impossible to meet or, at least, too burdensome. White specifically identified the requirements pertaining to collection of statistical information, computer compatibility, and on-base library resources. White concluded by relaying the threats of various institutions to withdraw from the QES program that he suggested would lead to a loss of educational opportunities for lower ranking airmen. Although the standards were revised before issuance, the Air Force implemented the QES standards in October 1992 without responding to most of White's concerns, and they remained in effect until 1995.

Because of White's statements about QES, the Air Force "lost confidence in [White's] ability to support" QES and reassigned him to a non-educational Administrative Officer position, without reduction in pay. (J.A. at 519.) After exhausting his administrative remedies, White filed an individual right of action with the Board alleging retaliation for protected whistleblowing, in contravention of the Whistleblower Protection Act of 1989 ("WPA"), Pub. L. No. 101-12, 103 Stat. 16. The proceedings in this case, unfortunately, have been ongoing for more than a decade.

In 1992, the administrative judge found that White's disclosures were not protected and dismissed his appeal. (J.A. at 511.) The full Board reversed and ruled that White's disclosures were protected because the concerns he expressed "were shared by a wide variety of educational institutions and other [Education Service Officers]," and remanded for a determination of whether the disclosures were a contributing factor in his detail. White v. Dep't of the Air Force, 63 M.S.P.R. 90, 96, 98-99 (1994) ("White I"). On remand, the administrative judge found that White's detail

"resulted from his disclosures on May 4 and 5, 1992," and ordered the Air Force to return White to his prior position. (J.A. at 515-16.)

The agency then appealed the remand initial decision to the full Board. In 1996, the full Board affirmed the remand initial decision under the "law of the case" doctrine. White v. Dep't of the Air Force, 71 M.S.P.R. 607 (1996) ("White II"). In a subsequent proceeding to consider arguments raised by the Office of Personnel Management ("OPM") as intervenor, the Board in 1998 again affirmed its decision. White v. Dep't of the Air Force, 78 M.S.P.R. 38 (1998) ("White III").

OPM then appealed to this court, which reversed the Board's decision and remanded for further proceedings. LaChance v. White, 174 F.3d 1378 (Fed. Cir. 1999) ("White IV"). We held that the Board had applied an improper test for "whether White had a reasonable belief that he uncovered gross mismanagement." Id. at 1380. We held that it was insufficient for White simply to demonstrate that others shared his views; the Board was required to conduct an objective review of the evidence as a disinterested observer. Id. at 1380-81. We stated that the proper test was whether a disinterested observer who had "knowledge of the essential facts known to and readily ascertainable by the employee" could reasonably conclude that the disclosure evidenced gross mismanagement. Id. at 1381 (emphasis added).

On remand, the administrative judge received additional evidence. The administrative judge concluded that White reasonably believed his disclosures evidenced gross mismanagement because the evidence showed that "management's actions had created a substantial risk in May 1992, that the providers of the educational services would leave the educational services program under the new standards of the

QES. That would have had a significant adverse impact upon the agency's ability to accomplish its educational services mission." (J.A. at 42-43.) The full Board reversed. The Board stated that, in its view, gross mismanagement "is more than de minimis wrongdoing or negligence and does not include management decisions that are merely debatable. It must also include an element of blatancy." White V, 95 M.S.P.R. at 11. The Board found:

> [A] disinterested observer in [White's] position would have known that the agency wanted to improve the quality of on-base education, that it formed a team to study and develop a way of meeting this aim, and that the team included agency educational employees and outside educational experts. A disinterested observer may have well concluded that the QES had shortcomings and that it may not have been the best process for achieving the agency's goal. Indeed, one of the agency officials who worked on the QES project testified that reasonable people disagreed about the QES process, and that some had concerns about the QES, and others did not. Similarly, a deponent for [White] . . . acknowledged that reasonable educational experts could disagree about the QES project.

Id. at 13-14 (internal citations omitted).

The full Board held that White had "disclosed a debatable management decision regarding a policy matter," and, as such, he did not have a reasonable belief that he disclosed gross mismanagement. Id. at 13. The Board therefore reversed the initial decision and denied relief. White appeals to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## DISCUSSION

The Board's decision must be affirmed unless it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule or regulation; or unsupported by substantial

evidence.  5 U.S.C. § 7703(c) (2000); <u>Carreon v. Office of Pers. Mgmt.</u>, 321 F.3d 1128, 1130 (Fed. Cir. 2003).

I

Petitioner first claims that the Board improperly considered whether White disclosed "gross mismanagement," rather than simply whether any belief about his disclosure was "reasonable."  According to petitioner, this Board action improperly disregarded this court's instructions in issuing the remand in <u>White IV</u>; ignored the Board's own law of the case; and deprived petitioner of due process of law.  We conclude that none of these arguments has merit.

The core of petitioner's argument is that this court remanded in <u>White IV</u> only for a review of "the basis for a party's beliefs as it relates to government misconduct," and, according to petitioner, it had already been determined that "gross mismanagement" existed.  (Pet'r Br. at 14-15.)  Petitioner is attempting to create a distinction where none exists.  In considering whether "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence gross mismanagement,"  <u>White IV</u>, 174 F.3d at 1381, it is by definition necessary to consider whether the gross mismanagement standard was satisfied.  The Board was correct to consider the gross mismanagement issue in determining whether White reasonably believed that he disclosed gross mismanagement.

II

This then brings us to the merits.  The Board properly rejected the government's argument below that disclosure of gross mismanagement required a showing of

"irrefragable proof" that agency officials did not perform their duties correctly, White V, 95 M.S.P.R. at 7-10, and the government wisely makes no attempt to renew this argument on review. The WPA does not require that whistleblowers establish gross mismanagement by irrefragable proof. Rather, we specifically held in White IV that "the proper test is this: could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence gross mismanagement?" White IV, 174 F.3d at 1381. In each case, the question is whether there has been "gross mismanagement" within the meaning of the statute.[1] However, the government argues that criticism of agency policy, as long as that policy is not unlawful or a gross waste of funds, can never be protected under the WPA. Contrary to the government's position we do not think that the WPA includes a blanket exception for policy disputes between the employee and the agency.

Mere differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement. In defining a protected disclosure, Congress in 1989 specifically chose to replace the "mismanagement" standard in the prior law with a more stringent "gross mismanagement" standard. WPA § 4, 103 Stat. at 32 (codified as amended at 5 U.S.C. § 2302(b)(8) (2000)). The statute, as amended, protects an employee who makes "any disclosure of information . . . which the employee . . . reasonably believes evidences . . . gross mismanagement." 5 U.S.C. § 2302(b)(8). As the Board correctly held in this case, debatable differences of opinion

---

[1] There is no contention in this appeal that White disclosed a gross waste of

concerning policy matters are not protected disclosures. Rather, for a lawful agency policy to constitute "gross mismanagement," an employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people.[2] The matter must also be significant. See Frederick v. Dep't of Justice, 73 F.3d 349, 353 (Fed. Cir. 1996).

A similar standard was articulated by the Ninth Circuit in Coons v. Secretary of the Treasury, 383 F.3d 879 (9th Cir. 2004).[3] In Coons, the Board found that a disclosure alleging that the Internal Revenue Service "processed a large, fraudulent refund for a wealthy taxpayer" under "highly irregular circumstances" was "normal disagreement between managers over a debatable matter of internal policy." Id. at 890. The Ninth Circuit rejected the Board's position because "Coons's disclosure cannot reasonably be characterized as a 'normal disagreement between managers over a debatable matter of internal policy.'" Id. The Ninth Circuit held that the actions of the agency, if true as alleged, would be considered "gross mismanagement." Id.

Contrary to the petitioner's contention, this standard hardly means that every agency policy is "debatable" simply because someone must have viewed it as a good idea when it was adopted. Not every policy-maker is necessarily a reasonable person. There may have been broad agreement among reasonable people that a policy was bad even at the time it was adopted; the employee need not establish a universal view

---

funds, an abuse of authority, or a violation of law.

[2] This non-debatable requirement does not, of course, apply to alleged violations of statutes or regulations. In that circumstance, there may be a reasonable belief that a violation has occurred, even though the existence of an actual violation may be debatable.

[3] The Ninth Circuit had jurisdiction because the case involved both a Board appeal and a discrimination claim. Coons, 383 F.3d at 884.

that the policy was a mistake. There may also be a question as to whether continuing to keep the policy in place at the time of the employee's disclosure was debatable. Many government policies, desirable or at least debatable at their inception, remain in place as the result of inertia or because those responsible do not wish to admit that the policy is no longer useful. The WPA is designed to protect those employees who call attention to such instances through a disclosure. There is again no requirement that there be a unanimous view that the continuation of the policy is a mistake.

Moreover, in determining whether there is gross mismanagement, we have held that the employee need only establish that there was gross mismanagement based on the information "known to and readily ascertainable by the employee." White IV, 174 F.3d at 1381. If the disclosure of that information indicated that error in adoption or continuation of the policy is not debatable, the disclosure is protected, regardless of whether the agency can marshal other information supporting the policy that the employee could not have reasonably obtained at the time of disclosure. We note in this respect that both sides have relied on reports, either criticizing or praising the QES program, that were issued after May 1992. (Pet'r Br. at 25; Resp't Br. at 16.) Such reports are irrelevant except insofar as they reflect other information that was available to the employee at the time of the disclosure. Also, contrary to the Board it is not necessary to show that the gross mismanagement is "blatant." White V, 95 M.S.P.R. at 11; see, e.g., Nafus v. Dep't of the Army, 57 M.S.P.R. 386, 394-95 (1993). In summary, we hold that where a dispute is in the nature of a policy dispute, "gross mismanagement" requires that a claimed agency error in the adoption of, or continued adherence to, a policy be a matter that is not debatable among reasonable people.

The Board found that the policy in question here, though significant, fell into the debatable category based on the information known to or reasonably ascertainable by the employee at the time of disclosure. These findings are supported by substantial evidence. The Board found that White was reassigned because of "his disclosures on May 4 and 5, 1992." (J.A. at 515.) The record is uncontradicted that the reassignment was because the Air Force "lost confidence in [White's] ability to support the Command's Bright Flag Quality Education System." (J.A. at 519.) White's criticisms were directed to, inter alia, the overall implementation, soundness and cost of the QES program. The Board properly considered whether the QES policy, as a whole, was debatable based on the information reasonably available to White at the time.

Petitioner bore the burden of establishing that, based upon the information known to and readily available to him at the time, the QES policy was not debatable. Petitioner pointed to three pieces of evidence to support his position.

First, petitioner pointed to the significant number of complaints and threats to leave the QES program by educational institutions. Though White knew of twenty-two letters from thirteen institutions complaining about the QES, and White claims to have heard about even more, (J.A. at 89,) there is nothing in the record to demonstrate whether, based on White's knowledge, these complaints reflect a consensus of criticism of the QES or just the views of a minority. Though the record does not reveal the total number of institutions that participated in the QES, the record establishes that there were at least fifty such institutions. The only consensus demonstrated by White's testimony was among "local" institutions. Moreover, the institutions that did complain

did not uniformly complain about the QES as a whole; some complained about only selected aspects of the program.[4] Even if White's reasonable knowledge were to be confined to the opinions of educational institutions — and he has not demonstrated this should be so — White has not satisfied his burden of establishing that, based on information reasonably available to him at the time, there was broad agreement among educational institutions that QES was a mistake.

Second, petitioner pointed to the fact that the QES program was repeatedly revised after his May 1992 disclosure, allegedly because of the protests from other Air Force commands and from educational institutions, and by 1996 had been eliminated. (J.A. at 28.) The mere fact that a program was revised and eventually eliminated four years later does not establish that it was a non-debatable mistake at the time of petitioner's disclosure. Indeed, the wisdom of a program may be debatable even at the time it is eliminated. So too the fact that some Air Force commands had objections to the QES program does not establish that it was not debatable.

Last, petitioner relied heavily on an Air Force report issued in 1995 criticizing many aspects of the QES program. (J.A. at 415-44.) The report concluded that "the benefits [of QES] are insignificant when compared to the workload and cost increase." It surmises that "[a]s the QES is currently working, there can be little genuine collegial-partnership between the [Air Force] and the [educational institutions]. The present relationship is more contractual requiring demonstration of compliance by the

---

[4] The University of Nevada, for example, complained that the program did not take into account local differences, thus requiring replication of library resources even when the campus library was close to base. The University of Phoenix, on the other hand, complained about the cost of evaluation and the overlap with regional accreditation.

[educational institutions] with the standards." Finally, it laments that the Air Force takes the side of "traditional academics [who] are slow to accept the proposition that education is not a fixed commodity to be delivered in equal rations to all comers," and that the "return to a traditional, compliance-based system as QES places [the Air Force] out of step with current academic trends." This evidence hardly indicates that QES was erroneous beyond debate. And even assuming that all the information contained in the report was available to White in 1992, the author of the report conceded in her testimony that "there [was] plenty of evidence to show" that "reasonable experts in education could disagree" on the merits of the QES program.

Indeed, petitioner's counsel conceded at oral argument that reasonable people could have disagreed about the Air Force's QES program and that under the "debatable" standard, petitioner cannot prevail.[5] The Board's conclusion that reasonable people would have found the merits of the QES program debatable at the time of disclosure is supported by substantial evidence.

---

[5] The following exchange occurred at oral argument:

THE COURT: Accepting the standard that the Board adopted here, whether the policy is a debatable one, with two sides to it, do you agree that your client would lose under that standard?

COUNSEL FOR PETITIONER: Yes, if that were the standard.

. . .

COUNSEL FOR PETITIONER: Certainly reasonable people can disagree. Academicians, educational officers with a great deal of experience were involved in writing the standards.

## CONCLUSION

Because a disinterested observer with knowledge of all the essential facts known to and readily ascertainable by White at the time of his disclosure would have concluded that the merits of the QES program that White criticized were debatable by reasonable people, White could not have a reasonable belief that he disclosed gross mismanagement. For this reason, the decision of the Board is

<u>AFFIRMED</u>.

## COSTS

No costs.