[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10285

_____

KAREN FUERST,

Plaintiff-Appellant,

*versus*

THE HOUSING AUTHORITY OF THE CITY OF ATLANTA,
GEORGIA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-02027-MHC

_____

Before NEWSOM, BRANCH, and BRASHER, Circuit Judges.

BRANCH, Circuit Judge:

By its plain text, the National Defense Authorization Act ("NDAA"), 41 U.S.C. § 4701 *et seq.*, protects employees of federal "contractor[s], subcontractor[s], grantee[s], [and] subgrantee[s] or personal services contractor[s]" from their employers' retaliation for disclosing information that the employee reasonably believes to be evidence of gross mismanagement of a federal contract or grant, an abuse of authority related to a federal contract or grant, or a violation of a law, rule, or regulation pertaining to a federal contract or grant. 41 U.S.C. § 4712(a)(1).

The NDAA notwithstanding, in 2017, Karen Fuerst—then an attorney employed by the Atlanta Housing Authority ("AHA"), which is a recipient of federal grant funds—was fired after challenging the negotiation tactics of AHA's new CEO, Catherine Buell. Fuerst's complaints filed with the Department of Housing and Urban Development ("HUD") inspector general and the United States District Court for the Northern District of Georgia were both dismissed for failure to state a claim under the NDAA.

On appeal, Fuerst argues that the district court erroneously concluded that § 4712 did not apply to her as an employee of a federal "grantee," and erroneously found that she merely alleged a difference of opinion, not a specific violation of a contract or grant.

We agree with Fuerst that she falls within the class of disclosing persons protected by § 4712; the district court erred in concluding otherwise.  Regardless, we affirm the district court because Fuerst failed to show that her belief that Buell's actions evinced gross mismanagement was reasonable.  Nor did she show that she had a reasonable belief that Buell's actions constituted an abuse of authority or a violation of a law, rule, or regulation. Accordingly, after careful review and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

### A.  Factual Background[1]

#### i.    The Atlanta Housing Authority

AHA is a corporation organized under Georgia's Housing Authorities Law, O.C.G.A. § 8-3-1, *et seq*.  Its bylaws describe the organization's mission to "provide quality, affordable housing in amenity rich, mixed-income communities for the betterment of the community."  According to Fuerst's complaint, AHA is the state's largest housing authority, providing and facilitating affordable housing for nearly 22,000 low-income households. Pursuant to Georgia's Housing Authorities Law, Atlanta's mayor appoints members to AHA's Board of Commissioners.  *See* O.C.G.A. § 8-3-50(a)(1).  However, according to Fuerst, HUD

---

[1] Because this case comes to us on appeal from a grant of a motion to dismiss, we adopt the factual allegations in Fuerst's complaint. *See Timson v. Sampson*, 518 F.3d 870, 872 (11th Cir. 2008) (per curiam).

provides the majority of AHA's funding and regulates the Authority's activity through conditional grant terms.

Historically, municipalities concentrated affordable housing units in discrete locations, or "housing projects." However, HUD now requires its grant recipients, including AHA, to develop new affordable housing units in "deconcentrated" communities. Hence, AHA currently finances "mixed-income" communities in Atlanta, in which a portion of units contain subsidized rent-reduced apartments for low-and-middle income residents.

But before AHA can provide affordable housing, developers must first agree to build it. Therefore, to incentivize builders, AHA enters into revitalization agreements with them, under which the parties agree to develop the sites of former public housing projects into mixed-use, mixed-income communities. Using money it receives from HUD grants, AHA provides the developers with subordinated loans, covering a portion of the construction costs for low-income units. To obtain additional financing, the developer and AHA both then apply for low-income housing tax credits ("LIHTCs") from the State, which they resell to high-income investors looking to mitigate tax burdens. LIHTCs are governed by the Internal Revenue Code and issued by the Georgia Department of Community Affairs ("GDCA"), which awards LIHTCs through a competitive application process. *See* 26 U.S.C. § 42.

LIHTCs are necessary to incentivize builders to engage in mixed-income housing development. After a builder constructs

the affordable housing units at the site of a former housing project, it may then engage in further market rate unit development; however, constructing additional affordable housing may risk exceeding HUD's cap on the percentage of affordable housing units at any given property. To qualify for LIHTCs, builders must own a qualifying "low-income building" by the end of the first year in which they claim the credits. 26 U.S.C. § 42(g)(3)(a). A taxpayer may elect to use one of three tests to qualify a building for LIHTCs; federal law makes that election "irrevocable."[2] *Id.* § 42(g)(1).

In AHA's mixed-income properties, developers rent 40% of the available units at market rates. The remaining 60% of units are split 20-40 into two affordable housing subsets, moderate income and "public housing-assisted" ("PHA") units. Developers receive AHA funding to build both types of affordable units, and, in addition, may apply for LIHTCs, issued by Georgia in accordance with federal tax law. *See* 26 U.S.C. § 42. Although LIHTCs sufficiently offset the decreased rent paid by moderate income

---

[2] The taxpayer may qualify using: (A) the "20-50 test," under which "20 percent or more of the residential units in [a] project are both rent-restricted and occupied by individuals whose income is 50 percent or less of area median gross income;" (B) the "40-60 test," which requires that "40 percent or more of the residential units in [a] project are both rent-restricted and occupied by individuals whose income is 60 percent or less of area median gross income;" or (C) the "[a]verage income test," which subject to certain restrictions, requires "40 percent or more . . . of the residential units in such project are both rent-restricted and occupied by individuals whose income" does not exceed an aggregate average of 60% of the area median gross income. *See* 26 U.S.C. § 42(g)(1).

renters to building owners, they alone do not incentivize owners to accept the even lower rate paid by PHA occupants. Thus, using its HUD grant funds, AHA supplements PHA renters' payments. Consequently, a building owner receives the same rate for PHA and moderate-income units.

Sometime in the late 1990s or early 2000s, AHA entered into a series of revitalization agreements with Integral, a local property developer, which gave Integral the right to develop former housing project sites in phases. Under the agreements, Integral would first build new affordable housing with AHA's assistance, and, afterwards, using private financing, it would complete the project by building market rate units. Ostensibly, AHA gained little by allowing Integral to engage in purely private development. On the other hand, the ability to build market rate units sweetened the pot for Integral, likely increasing its overall enthusiasm for the affordable housing components of the project. Notably, although the initial agreements between AHA and Integral reserved negotiation on the scope of Integral's private projects, they imposed a deadline on the exercise of those development rights to prevent Integral from sitting on the affordable housing projects in perpetuity.

### ii. Fuerst joins AHA

In 2010, Karen Fuerst was hired into AHA's general counsel's office, where she spent the next seven years receiving consistently positive feedback and was eventually promoted to Senior Vice President and Deputy General Counsel for Real Estate.

21-10285                Opinion of the Court                7

By 2016, Fuerst served on AHA's Investment Committee ("IC"), a management body that makes major decisions about the organization's policies and expenditures. According to Fuerst, she also served as "AHA's lead real estate counsel and its lead legal liaison with HUD." Under then-CEO Joy Fitzgerald, Fuerst claims that she was a trusted advisor and routinely consulted on most real-estate and policy matters.

Thus, when AHA agreed to allow Integral to develop the University Homes housing project—including certain "further leverage," or privately financed market rate units—in 2011, Fuerst was the lead attorney involved in the negotiations. By that point, the HUD-mandated, and AHA-subsidized, housing phases of the AHA-Integral revitalization plan for the University Homes site had been developed, the HUD revitalization grant had been fully expended, and the affordable housing portion of the project's units were completed and occupied by low- and middle-income residents. As a result, Integral could develop the remaining market rate units through private financing without constructing any more affordable units.

In January 2016, AHA hired Catherine Buell as its COO and, that September, it announced that she would serve as its next president and CEO starting in 2017. In late 2016, AHA's IC met several times to discuss various closings on Integral developments, which were partially funded with LIHTCs. Fuerst contends that, at these meetings, Buell: (1) "disavowed" the terms of existing agreements between AHA and Integral; (2) disavowed the terms of

recent AHA board approvals that Integral had included in its LIHTC applications to the GDCA; and (3) "arbitrarily sought to force Integral to instead agree to more onerous terms by continually delaying requests for the Board approvals," preventing AHA and Integral from closing prior to the date necessary to receive their LIHTCs.[3] Although Fuerst's complaint fails to specify these risks clearly, as best we can tell, she believed that Buell's plan jeopardized Integral's LIHTCs because Integral needed to proceed with market rate housing to avoid exceeding the concentration cap which was a part of AHA's and Integral's LIHTC election application. And Fuerst ostensibly feared that if Integral refused to reopen negotiations with AHA, the consequent failure to close on the private development portion of the project would then prevent AHA from receiving, and therefore selling, future LIHTCs, thereby threatening its ability to complete its mission to construct more affordable housing.

According to Fuerst, she "admonish[ed]" the IC regarding the risks that Buell's "proposed actions" posed to AHA's HUD grant and LIHTC funding sources, and, in response, Buell began to freeze her out of real estate negotiations at AHA. At first, Fuerst noticed that she was invited to fewer and fewer senior leadership meetings. Then, she discovered that AHA's website was altered to omit her as a senior leadership team member. In subsequent IC

---

[3] Although Fuerst references multiple agreements in her complaint, as best we can tell, the present dispute focuses on the University Homes agreement, in particular, as the relevant project for AHA's HUD grant. *See infra* n.5.

21-10285                Opinion of the Court                9

meetings, Fuerst, who had previously been consulted on all matters related to real estate, learned for the first time about various projects, despite being responsible for all relevant real estate legal issues. According to Fuerst, her exclusion meant that the IC was advancing deals without consulting internal counsel, and, to her knowledge, without input from outside counsel either.

Next, Fuerst claims that Buell and the then-General Counsel, Paul Vranicar, began to shunt real estate work to other AHA attorneys without Fuerst's supervision or input, and that Buell then walled her off from any discussion of Integral's projects. Allegedly, Buell also cut her out of communications with HUD regarding AHA's compliance with the terms of the federal HUD grant from which it benefited, despite Fuerst having previously been the lead legal liaison with HUD. Fuerst maintains that some of these communications included warnings from the GDCA about the potential loss of LIHTC funding due to AHA's failure to effectuate timely closings.

The situation between Fuerst and Buell continued to escalate. In December 2016, Fuerst informed Buell and Vranicar that Fuerst was aware of AHA's engagement of a recruiting firm to find a new management-level real estate attorney and that AHA was engaging in real estate projects without consulting her. Fuerst offered to resign, but Buell convinced her to stay, claiming that the new hire simply reflected an increase in expected workloads. Fuerst claims to have told Buell and Vranicar that she did not think that they "fully appreciate[d]" the context of the 2011 agreement

with Integral, and that it was possible that the previous CEO may even have "lied" to Buell about it. Fuerst offered to prepare a briefing on the agreement, and Buell accepted.

On February 16, 2017, Fuerst's dispute with Buell reached its zenith in an IC meeting over the latter's plan not to approve an upcoming financial closing with Integral unless Integral agreed to what Fuerst describes as "substantially new, less favorable terms" that "Buell was seeking to cram down onto Integral." Apparently, Fuerst asked Mike Wilson, AHA's business lead on the relevant deal, whether Buell's "proposed" terms violated the 2011 agreement between AHA and Integral, and Wilson said that they did. Fuerst explained to the IC that following Buell's strategy would "risk" both parties missing the LIHTC deadlines, thereby preventing them from financing construction, and, consequently, AHA's defaulting under the HUD grant agreement.[4] As the exchange between the two grew heated—Buell allegedly screamed at Fuerst over whether forcing Integral to accept new terms would violate a duty of good faith and fair dealing—Fuerst emphasized to the IC that it had approved AHA's LIHTC application the year before, which relied on the same terms that Buell now sought to renegotiate. Consequently, she explained, failure to close by the

---

[4] According to Fuerst, HUD's grant agreement with AHA mandated that financing for the first development project funded by the grant needed to be closed by March 28, 2017, and that HUD threatened to withdraw the grant funds as AHA's hardball tactics brought AHA and Integral closer to the deadline.

deadline would prevent AHA from applying for future LIHTCs, cause AHA to lose money, prevent AHA from accomplishing its mission, and put AHA at risk of losing the HUD grant, to say nothing of the damage to AHA's deal with Integral.

On or around February 20, 2017, twenty of AHA's senior leadership, including Fuerst and Buell, attended yet another meeting in which Buell took exception with the 2011 agreement with Integral. At the meeting, Buell also announced that the Atlanta Journal-Constitution would be running an article about the deal.

Much to Fuerst's surprise, on February 24, 2017, COO Mark Kemp and AHA's HR director told Fuerst that Fuerst was being investigated in conjunction with AHA's inquiry into the 2011 agreement, and that they were placing her on a two-to-four-week administrative leave, effective immediately. She then told AHA's HR director that she was notifying him that she was acting as a whistleblower under the NDAA. AHA terminated Fuerst on March 10, 2017, citing "a loss of confidence in [her] ability to provide legal counsel" on real estate matters.

## B. Procedural History

On November 8, 2017, Fuerst filed a retaliation complaint against Buell and AHA with HUD's Office of the Inspector General ("OIG"). On May 16, 2018, the OIG informed Fuerst that it had determined that she did not qualify as a whistleblower because she

was not a covered employee under the statute, and that it was issuing her a right-to-sue letter.

Fuerst filed suit against AHA in the United States District Court for the Northern District of Georgia on May 11, 2020, alleging that she was terminated in retaliation for whistleblowing, in violation of the NDAA. Specifically, Fuerst alleged that voicing opposition to Buell's negotiation tactics—which she viewed as evidence of either gross mismanagement; an abuse of authority; or a violation of a law, rule, or regulation—constituted protected activity under § 4712.

AHA moved to dismiss Fuerst's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). It argued that Fuerst's disclosure to the IC was not protected under the NDAA because it amounted to a "mere difference[] of opinion" regarding Buell's tactics, as evidenced by the fact that Fuerst had not identified any other employees who shared her perspective.[5] Additionally, AHA emphasized that Buell failed to identify a particular contractual or statutory provision that Buell violated or risked violating. Finally, AHA argued that the NDAA applies only

---

[5] We note that AHA also contended that, even if Buell's disclosure was protected, Fuerst failed to disclose information to a "required person" under the statute, only to the "alleged wrongdoers." Fuerst, in response, noted that the statutory text did not exclude alleged wrongdoers from persons to whom a disclosure could be made. However, because we affirm the district court's grant of AHA's motion to dismiss Buell's complaint on other grounds, we need not address this argument.

to federal contracts, and that AHA's contracts with Integral were not federal contracts under the statute.

In response, Fuerst argued that she pleaded sufficient facts to establish a reasonable belief that she made a protected disclosure by reporting evidence of gross mismanagement; an abuse of authority; or a violation of a law, rule, or regulation, and that the statute did not require her to show that other employees agreed with her position at the time. She also asserted that she had, in fact, identified the HUD grant agreement that she believed AHA violated. Finally, again pointing to the statutory text, Fuerst explained that the NDAA covered disclosures relating to "a Federal contract or grant," and her disclosures implicated AHA's grant agreement with HUD.

On December 28, 2020, the district court granted AHA's motion to dismiss. The district court rested its decision on two grounds: first, that the NDAA applies only to employees of federal contractors, not federal grant recipients; and, second, that even if Fuerst qualified for protection under the NDAA, her disclosures were not protected because they did not rise above the level of a "mere difference of opinion" and because she did not point to any action which violated a federal contract or grant. Fuerst timely appealed.

## II.    ANALYSIS

### A.  Standard of Review

"We review *de novo* the district court's grant of a motion to dismiss for failure to state a claim under [Federal Rule of Civil Procedure 12(b)(6)], accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Timson v. Sampson*, 518 F.3d 870, 872 (11th Cir. 2008) (per curiam). To survive a motion to dismiss, a "complaint need only present sufficient facts, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1243–44 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). Likewise, we review *de novo* a district court's interpretation of statutory text. *See Pinares v. United Tech.*, 973 F.3d 1254, 1259 (11th Cir. 2020).

### B. Scope of the NDAA

As an initial matter, Fuerst must demonstrate that she, as an employee of a federal grant recipient, is an employee protected by the NDAA. Based on the plain and unambiguous statutory text, we conclude that the NDAA protects whistleblower employees of all federal "grantee[s]," including, in this case, AHA.

Statutory interpretation starts, and ideally ends, with the text. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). And "when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Id.* (quotation omitted). Granted, statutory language does not exist in a vacuum, and "[w]e must interpret statutes 'harmoniously,' reconciling separate sections so that they are compatible and not contradictory." *In re Shek*, 947 F.3d 770, 777 (11th Cir. 2020) (quoting Antonin Scalia &

Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012)).   Further, the "surplusage canon obliges us, whenever possible, to disfavor an interpretation when that interpretation would render a 'clause, sentence, or word . . . superfluous, void, or insignificant.'" *Id.* (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). *See also Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 536 n.4 (2021).

With that in mind, we turn to the provision of the NDAA at issue in this case, § 4712(a), which, in relevant part, prohibits certain entities receiving federal funds from retaliating against their employees for reporting evidence of misconduct in certain circumstances.  Section 4712(a)(1) provides that:

> **(1)    In general.**—An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2)[6] information that the employee reasonably

---

[6] Paragraph (2) of § 4712(a) lists the persons and bodies to whom a covered employee may make a protected disclosure.  Covered persons and bodies include:

> (A) A Member of Congress or a representative of a committee of Congress.
>
> (B) An Inspector General.
>
> (C) The Government Accountability Office.

believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1).

Without question, the district court was correct that § 4712 protects "employee[s]" of "contractor[s]" and "subcontractor[s]" from being "discharged, demoted, or otherwise discriminated against as a reprisal" for whistleblowing. *Id.* But the district court failed to appreciate that Congress did not stop there. Instead, the enacted text of § 4712 also extends that protection to "employee[s]" of "grantee[s]," "subgrantee[s]," and "personal services contractor[s]." Accordingly, as the statute clearly covers federal

_____

(D) A Federal employee responsible for contract or grant oversight or management at the relevant agency.

(E) An authorized official of the Department of Justice or other law enforcement agency.

(F) A court or grand jury.

(G) A management official or other employee of the contractor, subcontractor, grantee, or subgrantee who has the responsibility to investigate, discover, or address misconduct.

41 U.S.C. § 4712(a)(2).

grantees and because AHA is a federal grant recipient, employees of AHA—including Fuerst—are covered by the provision.

Yet, the district court reached a different conclusion. Looking to a different provision of the statute—41 U.S.C. § 4705 ("Protection of contractor employees from reprisal for disclosure of certain information")—which extends whistleblower protections to employees of federal contractors only, the district court relied on the similarity between the statutory titles to read § 4712 ("Enhancement of contractor protection from reprisal for disclosure of certain information") as a restatement of, rather than an addition to, § 4705's protections. In its analysis, because § 4705 defined a "[c]ontract" as "a contract awarded by the head of an executive agency," and a contractor as "a person awarded a contract with an executive agency," § 4712 must therefore apply only to conduct between the federal government and its contractors, not its grant recipients. *Fuerst v. Housing Authority of City of Atlanta, Ga.*, 2020 WL 8299763, *4–6 (N.D. Ga. Dec. 28, 2020) (*citing* 41 U.S.C. §§ 4705, 4712). In so doing, however, the district court ignored the plain language of § 4712, which clearly includes employees of federal grant recipients like Fuerst. Further, to embrace the district court's holding and construe the text to limit whistleblower protections to private contractors would necessarily render the statute's "grantee," "subgrantee," and "personal services contractor" language mere surplusage. *See In re Shek*, 947 F.3d at 777. Pursuant to the surplusage canon, we strive to avoid such interpretations.

Despite AHA's request that we follow the lead of the district court in giving effect to the statutory title of § 4712, federal courts are not responsible for policing Congress's consistent use of headings throughout a large and complex act. Rather, "where, as here, the [statutory] text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner." *Lawson v. FMR LLC*, 571 U.S. 429, 446–47 (2014) (quotation omitted).[7]    Thus, to determine whether § 4705 constrains § 4712, we must look to the enacted text of those statutes. Section 4705 provides that:

> An employee of a *contractor* may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a Member of Congress or an authorized official of an executive agency or the Department of Justice information relating to a substantial violation of law related to a *contract* (including the competition for, or negotiation of, a contract).

41 U.S.C. § 4705(b) (emphasis added). In other words, § 4705 does exactly what its title says: it enacts whistleblower protections for employees of federal contractors, and *only* federal contractors. In contrast, § 4712 uses the terms "contractor, subcontractor, *grantee, or subgrantee* or personal services contractor . . . ." 41 U.S.C.

---

[7] We note that, in *Lawson*, the Supreme Court explicitly rejected a similar argument about the role of statutory headings in determining the scope of whistleblower protections in the Sarbanes-Oxley Act, 18 U.S.C. § 1514A. *Id.*

§ 4712(a)(1) (emphasis added).  Moreover, while § 4705 focuses on violations relating to federal contracts, § 4712 protects disclosures relating both to "Federal contract[s]" and "grant[s]." *Id.* Therefore, § 4712 clearly provides broader antiretaliation protections than its title suggests.  And as AHA is certainly a federal grantee, Fuerst falls within the protection of the statute.

We also note that, by holding that § 4712 provides greater whistleblower protections than § 4705, we reach a similar conclusion to the Fifth Circuit, the only other Circuit Court to consider the scope of § 4712.  The panel in *Tex. Educ. Agency v. U.S. Dep't of Educ.*, held that § 4712(a)(1) "by its terms, applies to *any* federal contract or grant and is not limited to a particular appropriation or class of grant."  992 F.3d 350, 354 (5th Cir. 2021). We agree.

In contrast, AHA urges us to follow the same Colorado district court case upon which the district court in this case relied, *Armstrong v. Arcanum Group Inc.*, 2017 WL 4236315 (D. Col., Sept. 25, 2017).  But, like the district court here, the *Armstrong* court mistakenly used § 4705's definitions of "contract" and "contractor" to define the statutory text of § 4712 based on the appearance of the term "contractor" in the latter's title.  Section 4705's definitions could certainly bear on Congress's use of the same words in § 4712.  But the mention of "contractor protection[s]" in § 4712's title cannot justify ignoring, or rendering superfluous, the rest of a law properly enacted through bicameralism and presentment.  *See Lawson*, 571 U.S. at 446–47;

*In re Shek*, 947 F.3d at 777.  Tellingly, AHA does not even attempt to rebut Fuerst's surplusage argument.

Under our Constitution, Congress writes the laws, not the federal judiciary.  We hold that the district court erred in determining that the NDAA does not apply to employees of grantees of federal funds.

### C.  Gross Mismanagement

To prevail on appeal, however, Fuerst must establish more than the fact that she was an "employee" of an entity listed in § 4712(a)(1).

Rather, pursuant to the statute, she must also demonstrate that she:

> disclose[d] . . . information that [she] *reasonably believe[d] [was] evidence of gross mismanagement* of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1) (emphasis added).

The district court, relying on the Federal Circuit's decision in *White v. Dep't of the Air Force*, 391 F.3d 1377, 1381 (Fed. Cir. 2004), found that Fuerst's allegations failed to show a reasonable belief of gross mismanagement because they were merely

"differences of opinion" which failed to identify any actual violations of the HUD grant's terms.

In Fuerst's view, the statutory language requires her to show only that she *reasonably believed* that her disclosure provided evidence of gross mismanagement, an abuse of authority, or a violation of a law, rule, or regulation, not that an actual violation occurred.[8]  According to Fuerst, her good faith belief based on decades of experience in housing development and finance, that forcing Integral to renegotiate would necessarily result in AHA's failure to qualify for LIHTCs, and, as a result, prevent it from complying with the HUD grant's closing requirement, was a "disclos[ure] [of] . . . information that [she] reasonably believe[d] was evidence of gross mismanagement of a Federal . . . grant." *See* 41 U.S.C. § 4712(a)(1).

While we agree with Fuerst that § 4712(a)(1) requires only a disclosure that a covered person "reasonably believes" indicates gross mismanagement, an abuse of authority, or a violation of a law, rule, or regulation, we nevertheless conclude that Fuerst's belief was not objectively reasonable as a matter of law.

---

[8] Fuerst further maintains that, despite not being required to identify any actual violation, in her complaint she identified several actions taken by Buell that violated HUD grant conditions.  Specifically, she points to her comments to Buell, AHA's general counsel, and AHA's HR director that Buell's actions could cause AHA to default on timely delivery of new affordable housing, which, in turn, could allow HUD to revoke a $30 million grant to AHA.

Starting, as always, with the plain text of the statute, § 4712 protects disclosures of "information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant." 41 U.S.C. § 4712(a)(1). Although, as noted by the district court, reporting an actual rule violation could establish a reasonable belief under § 4712(a)(1), the statutory language clearly does not require Fuerst, or any plaintiff, to prove that one occurred. Instead, Fuerst only needs to show that she had (1) a reasonable belief that the information she disclosed (2) was evidence of gross mismanagement.

Hence, to ascertain whether Fuerst was entitled to § 4712's protection, we must first determine the meaning of "reasonable belief," "gross mismanagement," and a "reasonable belief of gross mismanagement"—terms not defined by the statute. To that end, we note that § 4712(a)(1) mirrors the text of another federal whistleblower law's anti-retaliation provision—5 U.S.C. § 2302(b)(8) of the Whistleblower Protection Act of 1989 ("WPA"), 5 U.S.C. § 1201, *et seq.*, Pub. L. 101-12, and caselaw interpreting the WPA provides analytical guidance.

Section 2302(b)(8) of the WPA prohibits federal agencies from retaliating against employees for disclosing wrongdoing. According to its text, a federal employer may not:

> take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of . . . any disclosure of information . . . which the employee

21-10285                Opinion of the Court                23

> *reasonably believes evidences* – any violation of any
> law, rule, or regulation or . . . gross mismanagement,
> a gross waste of funds, an abuse of authority, or a
> substantial and specific danger to public health or
> safety . . . .

5 U.S.C. § 2302(b)(8) (emphasis added).[9]

The Federal Circuit defined a "reasonable belief," and later a "reasonable belief" of "gross mismanagement," as used in § 2302(b)(8) of the WPA in two cases, *Lachance v. White* and

---

[9]  Meanwhile, Congress extended substantially similar whistleblower protections to certain non-federal employees through the NDAA, § 4712. Again, that statute, in relevant part, provides that any covered employee:

> [M]ay not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing . . . information that the employee *reasonably believes is evidence* of gross mismanagement . . . a gross waste of Federal funds, an abuse of authority . . . a substantial and specific danger to public health or safety, or a violation of a law, rule, or regulation . . . .

41 U.S.C. § 4712(a)(1) (emphasis added).

Accordingly, because § 4712(a)(1) of the NDAA and § 2302(b)(8) of the WPA both deal with whistleblower protections relating to the misuse of federal funds, we interpret them together. *See United States v. Tigua*, 963 F.3d 1138, 1143 (11th Cir. 2020) (*quoting* Scalia & Garner, *Reading Law* § 39, at 252) ("Statutes *in pari materia* are to be interpreted together, as though they were one law"); *Gallardo by and through Vassallo v. Dudek*, 963 F.3d 1167, 1178 n.15 (11th Cir. 2020).

*White v. Dep't of Air Force*.[10]    First, in *Lachance v. White*, canvassing the meaning of a "reasonable belief" in other legal contexts, the Federal Circuit concluded that:

> [T]he proper test is . . . [whether] a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence gross mismanagement? A purely subjective perspective of an employee is not sufficient even if shared by other employees.

174 F.3d 1378, 1381 (Fed. Cir. 1999) ("*White I*"). And, as the Federal Circuit later clarified, again in the § 2302(b)(8) context, "debatable differences of opinion concerning policy matters are not protected disclosures." *White v. Dep't of Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004) ("*White II*"). "Rather, . . . to constitute 'gross mismanagement,' an employee must disclose such serious errors . . . that a conclusion . . . [of] err[or] is not debatable among reasonable people." *Id.*

---

[10] It is possible that we have never interpreted this statutory language because, in 1982, seven years before Congress first enacted the WPA, it vested exclusive appellate jurisdiction over most whistleblower complaints in the Federal Circuit, where it remained until 2012. *See* 5 U.S.C. § 7703(b) (1982), Pub. L. 97-164; 5 U.S.C. § 7703(b) (2012), Pub. L. 112-199. *See also Kelliher v. Veneman*, 313 F.3d 1270, 1274 (11th Cir. 2002) (explaining that, during that time period, the Eleventh Circuit had jurisdiction only over petitions of "mixed" cases involving whistleblower and discrimination claims).

21-10285                Opinion of the Court                25

We agree with the Federal Circuit's analysis.  And, given the similarity between § 4712(a)(1)'s language and § 2302(b)(8), we adopt the Federal Circuit's interpretation of "reasonable belief" and a "reasonable belief" of "gross mismanagement" for § 4712(a)(1) purposes.  *See Tigua*, 963 F.3d at 1143; *Dudek*, 963 F.3d at 1178 n.15.

Accordingly, § 4712(a) requires that an eligible person "reasonably believe[]" that her disclosure evidences gross mismanagement.  *See* 41 U.S.C. § 4712(a)(1).  Likewise, by protecting disclosures pertaining to "gross mismanagement," rather than ordinary mismanagement, Congress limited whistleblower protection to disclosures about particularly egregious conduct, not run-of-the-mill policy disputes between managers and employees.  *See* "Gross," "Mismanage[ment]," *Webster's New World College Dictionary*, 640, 935 (5th ed. 2014) (defining "gross" as "glaring; flagrant; very bad," and "mismanage" as "to manage or administer badly or dishonestly"); *White II*, 391 F.3d at 1382 ("[D]ebatable differences of opinion concerning policy matters are not protected disclosures.").  In sum, section 4712(a) thus asks whether an employee has an objectively reasonable belief that the disclosed information evidenced "such serious errors . . . that a conclusion . . . [of] err[or] is not debatable among"

objectively reasonable persons with knowledge of the essential facts.[11] *White II*, 391 F.3d at 1382.

Applying this clear articulation of § 4712's "gross mismanagement" prong and "reasonable belief" standard to Fuerst's complaint, we hold that Fuerst failed to establish a reasonable belief that her disclosure evidenced gross mismanagement. Fuerst is correct that the district court did not explicitly analyze whether her belief was reasonable. Instead, the district court proceeded to apply the Federal Circuit's "gross mismanagement" test and found that Fuerst's allegations failed to satisfy it. [Doc. 48 at 17] Though this may seem like putting the cart before the horse, it was not erroneous. After all, to "reasonably believe[]" that her disclosure evidenced gross mismanagement, Fuerst needed to interpret "gross

---

[11] Fuerst argues that the district court improperly required her to show proof that other employees contemporaneously agreed with her position. It did not. Regardless, the subjective views of other employees would not matter. Hence, we agree with the Federal Circuit that "[a] purely subjective perspective of an employee is not sufficient even if shared by other employees." *White I*, 174 F.3d at 1381. By the same token, we clarify that district courts should not treat evidence that other employees disagreed with a whistleblower as establishing that an objectively reasonable person would not reach the whistleblower's conclusion. Especially in a retaliation context, carrying with it the implied threat of reprisal, a colleague's disagreement may simply reflect a desire for self-preservation. We do not consider whether agreement or disagreement by an employee owing legal duties to a corporation, *e.g.*, corporate counsel, rather than management, has probative value in an NDAA retaliation suit.

mismanagement" correctly. Clearly, Fuerst disagreed with Buell about how to deploy federal grant funds. But to obtain protection under § 4712, she needed to demonstrate that she reasonably believed that she disclosed evidence of "gross mismanagement." This requirement means that Fuerst must show that a "disinterested observer with knowledge of the essential facts known to and readily ascertainable by [Fuerst] [would] reasonably conclude that the actions of . . . [Buell] evidence" violations flagrant enough to obviate disagreement. See White I, 174 F.3d at 1381.

Returning to Fuerst's complaint, she generally alleged that Buell's plan to force Integral to renegotiate its agreement with AHA by refusing to close would threaten AHA's ability to qualify for LIHTCs, which, in turn, would prevent it from closing on or before March 28, 2017, the date specified in the HUD grant agreement. But, at the time, Buell's plan was just that—a plan. Fuerst did not allege that Buell could unilaterally force AHA to take action with respect to its agreements with Integral, or that the other members of the IC were on board. Instead, Fuerst, allegedly familiar with the IC's role, challenged the course of action for which Buell sought IC approval. Because the challenged action was not final, and Fuerst knew that the decision was not final, in turn, she necessarily knew that her disclosure was premature, too.

Moreover, at least at the time that Fuerst made her disclosures, she simply could not know how Integral would ultimately respond: Fuerst was not even fired until March 10, 2017, weeks before the closing deadline mandated by the HUD grant

agreement. Hence, she could not know whether AHA would refuse to close on its agreements with Integral, let alone that, in response to AHA's sudden obstinance, Integral would ultimately walk away rather than renegotiate. Indeed, even if Integral refused to renegotiate at first, it had ample time to change its mind. Thus, even if Buell and the IC followed through, those hardball tactics could just as easily have led to AHA and Integral reaching an accord prior to the LIHTC deadlines. In that event, timely closings for the LIHTCs would completely ameliorate any perceived risk to the HUD grant funds.

Meanwhile, Fuerst does not even attempt to show how the mere act of renegotiating with Integral, without missing deadlines and thereby jeopardizing LIHTCs or the HUD grant, would lead to a "conclusion . . . [of] err[or] [that] is not debatable among" objectively reasonable persons with knowledge of the essential facts. *White II*, 391 F.3d at 1382. In fact, in her complaint, Fuerst concedes that "there was no harm in seeking to renegotiate a deal." We agree: at the point of Fuerst's disclosure, Buell's negotiation tactic simply had not yet matured into anything resembling "gross mismanagement."

Section 4712 protects whistleblowers who reasonably believe that they are reporting evidence of gross mismanagement. But § 4712 does not permit an employee to blow the whistle *before* the foul. Fuerst fell short of establishing a reasonable belief that her disclosure evidenced gross mismanagement, or, really,

anything more than a dispute with her boss about negotiation tactics.

### D. Abuse of Authority

In addition to asserting that Buell's actions constituted "gross mismanagement," Fuerst also insisted that they amounted to an abuse of authority pursuant to § 4712, defined as "an arbitrary and capricious exercise of authority that is inconsistent with the mission of the executive agency concerned or the successful performance of a contract or grant of such agency."  41 U.S.C. 4712(g).  The district court, however, failed to consider whether Fuerst's complaint could survive a motion to dismiss under this prong of the statute.

Federal Rule of Civil Procedure 8(a) provides the standards for most civil complaints in federal court.  Fed. R. Civ. P. 8.  Rule 8(a)(2) requires that a plaintiff provide the court and opposing party with "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "Each allegation must be simple, concise, and direct," but "[n]o technical form is required."  Fed. R. Civ. P. 8(d)(1).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Chapparo v. Carnival Corp.*, 693 F.3d 1337, 1335 (11th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Accordingly, where a plaintiff has pleaded "facts sufficient to show that her claim has substantive plausibility," the federal rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory

supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (quotations omitted). *See also Marsteller for Use and Benefit of United States v. Tilton*, 880 F.3d 1302, 1314 n.23 (11th Cir. 2018).

Fuerst's complaint, which explicitly referred to Buell and AHA's actions as "an abuse of authority"—and even described them as "arbitrary and capricious" and "inconsistent with AHA's successful performance under HUD grant agreements"—satisfied Rule 8(a)(2). Hence, the district court's omission of that claim in its ruling on AHA's motion to dismiss, without explanation, was clearly erroneous.

But we may affirm the district court's judgment on any ground within the record. *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356 (11th Cir. 2018). To that end, we hold that Fuerst failed to establish that she had a reasonable belief that Buell's actions constituted an "abuse of authority" for the same reasons that Fuerst cannot establish a reasonable belief that her disclosure evidenced "gross mismanagement." Remember, Fuerst's assumption that Integral would refuse to acquiesce to any of Buell's new terms is, itself, a key component of Fuerst's claim that renegotiation would prevent the parties from closing on their LIHTCs in compliance with the HUD grant requirements. But, at the time of her disclosure, Fuerst was an attorney, not a fortune teller. Hence, because Fuerst cannot demonstrate how Buell's proposed renegotiation tactic, independent of Integral's prospective actions, would be "inconsistent" with AHA's mission

of providing affordable housing. In effect, by failing to plead more than mere speculation that Buell's actions *could* result in a parade of horribles, Fuerst's claim also fails. Accordingly, we affirm the district court's dismissal of Fuerst's complaint.

### E. Violation of Law, Rule, or Regulation

Although Fuerst admits that she never pleaded that her disclosures constituted evidence of a "violation of law, rule, or regulation" in proceedings below, she maintains that, due to the lenient Rule 8 pleading standards, the district court should have asked whether she "reasonably believe[d]" her disclosures were "evidence of . . . a violation of [a] law, rule, or regulation related to a Federal . . . grant," nevertheless. 41 U.S.C. § 4712(a)(1). As noted earlier, the district court concluded its analysis at "gross mismanagement," instead.

Without question, in her initial complaint, Fuerst asserted a "violation of [a] law, rule, or regulation" claim: she warned the IC members that without a timely closing, Integral and AHA would lose their LIHTCs, and potentially be barred from applying for them in the future, which, in turn, could threaten AHA's HUD grant. But Fuerst failed to establish a reasonable belief of a "violation of a law, rule, or regulation" in relation to a federal grant for the same reasons that doom her "gross mismanagement" and "abuse of authority" claims: she neglected to proffer any evidence establishing that, as a result of Buell's actions or otherwise, AHA violated any law, rule, or regulation. Consequently, we affirm the district court's dismissal of Fuerst's complaint.

### III.    CONCLUSION

When Congress and the President enacted § 4712 of the NDAA, they extended its protections to employees of federal grantees, not just federal contractors.  Accordingly, we now vacate the district court's holding that employees like Fuerst could not qualify for whistleblower protections.

However, we affirm the district court because Fuerst nevertheless failed to establish a reasonable belief that her disclosure evidenced "gross mismanagement," an "abuse of authority," or a violation of a "law, rule, or regulation" pertaining to a federal grant.  Accordingly, Fuerst failed to state a claim upon which relief can be granted.

**AFFIRMED.**